Pittsburgh, Appellant, *v.* Pennsylvania Public Utility Commission.

378

Argued January 16, 1956; reargued October 2, 1956. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and CARR, JJ.

*J. F. McKenna, Jr.,* City Solicitor, with him *David Stahl,* Assistant City Solicitor, for City of Pittsburgh, appellant.

*Jack F. Aschinger,* Assistant Counsel, with him *Albert E. Luttrell,* Assistant Counsel, and *Thomas M. Kerrigan,* Acting Counsel, for Public Utility Commission, appellee.

*Paul H. Rhoads,* with him *John P. Egan, Jr., William Anderson, Jr., Howell C. Mette, Walter W. Shearer,* and *Rhoads, Sinon & Reader,* for utility company, intervening appellee.

*Irving R. Segal,* with him *Wm. A. Schnader,* and *Schnader, Harrison, Segal & Lewis,* for consumer, intervening appellee.

OPINION BY RHODES, P. J., November 13, 1956:

This is an appeal by the City of Pittsburgh from the order of the Pennsylvania Public Utility Commission of October 18, 1955. The appeal presents to us for review two issues arising in the rate case of The Manufacturers Light and Heat Company—rate of return and rate structure. These issues, inter alia, were previously before us in *Pittsburgh v. Pennsylvania Public Utility Commission,* 178 Pa. Superior Ct. 46, 72, 112 A. 2d 826, allocatur refused, 178 Pa. Superior Ct. xxviii.

The Manufacturers Light and Heat Company, a wholly owned subsidiary of Columbia Gas System, Inc., filed tariff supplements with the commission on October 7 and 8, 1953, providing for a proposed increase in total revenues of over $5,800,000. The supplemental tariffs were to become effective in sixty days. The commission suspended the operation of the proposed supplements for a total of nine months from their ef-

fective dates; and after hearings the commission, by its order of August 23, 1954, allowed an increase in operating revenues of about $2,900,000.[1]

Supplement No. 11 to tariff No. 37, and supplement No. 4 to tariff No. 38 were thereupon filed by Manufacturers containing revised rates to produce annual revenues as prescribed by the commission. The City of Pittsburgh and three industrial consumers appealed to this Court, and presented seven issues for our consideration. On five of these we affirmed the action of the commission, but on the remaining two, rate of return and rate structure, we remanded the record to the commission for further hearing and findings. The remand hearing was held before the commission on June 20, 1955, at which Manufacturers presented two witnesses. One testified on the subject of rate of return and the other on the rate structure. Various exhibits were also offered. No evidence was submitted by the City of Pittsburgh or the other complainants. On October 18, 1955, the commission issued its order reaffirming its prior determination on both issues. The City of Pittsburgh then appealed to this Court.[2]

---

[1] The commission allowed operating revenues of $39,921,985; operating expenses, including income tax, of $34,721,985; and a return of 6½ per cent on fair value of $80,000,000 or $5,200,000.

[2] On December 30, 1954, Manufacturers filed new supplements to tariffs 37 and 38 requesting further increases. Hearings were held before the commission, and by its order of January 3, 1956, it allowed approximately three-fourths of the requested increases. A number of appeals (42) were then taken from this order. The new rates became effective January 20, 1956. Consequently our decision in the present case will necessarily be limited to the question of refunds in accordance with the stipulation of Manufacturers of October 7, 1954. The stipulation provided: ". . . if the Superior Court finds that the rates that the Company made effective on September 7, 1954, pursuant to the order of the Public Utility Commission of August 23, 1954, are excessive, the company will

RATE OF RETURN. In the original proceeding the commission by its order of August 23, 1954, found 6½ per cent to be a fair and reasonable rate of return to be applied to the fair value finding of $80,000,000, resulting in an annual return to Manufacturers of $5,200,000. In making this determination the commission found as a fact that the cost of capital to Manufacturers was identical with the cost of capital to Columbia Gas System, Inc., since Manufacturers is wholly owned by Columbia and obtains all of its capital from Columbia. The cost of capital was found to be within the range of 6.05-6.31 per cent.[3] The commission then observed that the current market capital costs were fluctuating, and in fixing the fair rate of return at 6.50 per cent it made an allowance over and above the maximum cost of capital of .19 per cent for "normal risks and uncertainties associated with financing in the capital markets." We rejected this additional amount as it had no foundation in the evidence of record. Besides, the reasons offered for its support were incorporated in the considerations which of necessity entered into the determination of the cost of capital. Thus there would be a double allowance for the same factors. The issue again before us is the propriety of the allowance of .19 per cent above the cost of capital to the utility.

promptly refund the difference between the amounts which it has collected under said rates and the amounts which it would have collected under rates finally fixed by order of this Court or the Pennsylvania Public Utility Commission."

[3] If a balanced capital structure were applied the commission fixed the composite cost range between 6.18-6.31 per cent. See discussion in *Pittsburgh v. Pennsylvania Public Utility Commission*, 178 Pa. Superior Ct. 46, 69, 112 A. 2d 826. Cf. *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 171 Pa. Superior Ct. 187, 207, 90 A. 2d 607.

At the remand hearing, Manufacturers' witness, F. H. Crissman, treasurer of Columbia Gas System, Inc., conceded that the actual cost of capital to Manufacturers was identical with the cost to Columbia because the latter supplies the entire debt and equity capital for Manufacturers, its wholly owned subsidiary. The commission again made the capital cost for Columbia applicable to Manufacturers in determining fair rate of return. As all of the capital supplied to Manufacturers comes from Columbia, and as this has been obtained at prime rates in the period under consideration, we find no error in using this evidence in determining the cost of capital to Manufacturers under the circumstances. The advantage in obtaining money which results from this system should enure to the benefit of the consuming public as well as to the utility.

The commission, having again found after the remand hearing that the cost of capital to Manufacturers was 6.18-6.31 per cent, made the further allowance of .19 per cent as a "judgment allowance . . . to provide a slight margin for adverse fluctuations in the general market and for deviations from recent typical market conditions that might be experienced by respondent in actually obtaining capital." The evidence in support of this arbitrary allowance was equally general and intangible in substance; and the argument that the commission's finding of the cost of debt capital may have been too low fails to justify an allowance above the over-all cost of capital.

The witness Crissman, at the remand hearing, testified that an allowance over the cost of capital should be made to provide "for uncertainties with respect to financing which are not fully reflected in the cost of capital." This was based on the witness' appraisal of the earnings of Manufacturers in the past few years,

which, in his opinion, would have necessitated the payment of a higher price for capital than that indicated by the general market. It is manifest that this reason is one which relates solely to the cost of capital and having been once considered affords no basis for an additional allowance. Furthermore, the uncertainties of the market are not necessarily those which would be adverse to the utility; the market fluctuates in both directions. In fact the commission considered these market characteristics in making a downward revision of the cost of capital because the 1953 market was unusually high, returning to the 1952 level early in 1954. Having thus specifically considered this downward trend in determining the cost of capital, the commission could not thereafter nullify this consideration by making an upward adjustment or allowance over the cost of capital based upon future uncertainties. In rationalizing its action, the commission states: "The finding of 6.18 per cent to 6.31 per cent as the current cost of capital was based upon statistical evidence which was factual evidence of the market investor's appraisal of the comparative risks of respondent's natural gas operations under typical market conditions of the recent past, but it made no provision for *possible adverse future fluctuations* in general market levels or for *any adverse deviation* from recent typical market conditions that *might* be experienced by respondent in actually obtaining capital." [Italics supplied.] It is significant that the commission subsequently, in its order, indicates the practical impossibility of doing exactly what it had done. It said: ". . . but no one is sufficiently gifted to predict exactly what minimum yield investors would actually require on a proposed security issue." We think it is inconsistent for the commission to predict in one portion of its order that allowance of

.19 per cent is sufficient to absorb any possible future adverse market fluctuations and in the next disclaim the gift of foresight. The commission is not empowered to base a finding upon "conjectural and unsatisfactory estimates." *Railroad Commission of the State of California v. Pacific Gas and Electric Co.,* 302 U. S. 388, 397, 58 S. Ct. 334, 82 L. Ed. 319, 325. We are unable to find any factual evidence in this record of reasonably foreseeable adverse fluctuations.[4] If such proof had been presented it could then have been considered in determining the cost of capital. Certainly there are not two kinds of cost of capital. Cost of capital is the determination of a percentage, based upon the factual evidence, of what it will cost a utility to obtain debt and equity capital. The best evidence of this relates to the recent past; this was considered here. The rate of return is determined to operate in the future. The market admittedly fluctuates constantly. The best evidence, if not the only reliable evidence for these purposes, is the experience of the past. A prediction of a future market in the guise of an exercise of judgment is unwarranted. The judgment embodied in the function of rate making, which is a legislative power, is not of this nature; it is a judgment to be exercised by the commission upon the facts presented. Section 301 of the Public Utility Law, Act of May 28, 1937, P. L. 1053, as amended, 66 PS §1141, provides that the rates of public utilities shall be "just and reasonable." As we have frequently said, the rate must be such as to provide a fair return on the fair value of a utility's property used and useful in the public service. Such rate necessarily varies with the particular circumstances of each case and must therefore be determined

---

[4] In fact, the witness Crissman testified: "At the moment market conditions are generally good but conditions could change . . ."

according to the facts presented. *Pittsburgh v. Pennsylvania Public Utility Commission,* 165 Pa. Superior Ct. 519, 531, 69 A. 2d 844. As said in *Berner v. Pennsylvania Public Utility Commission,* 382 Pa. 622, 632, 633, 116 A. 2d 738, 744: "A proper rate of return, which of course should be reasonable and not confiscatory, is necessarily to be determined from the evidence adduced." There can be no set formula. "Under normal conditions a number of factors, if shown by the evidence, may be considered in determining a fair rate of return. Among them are: (1) The amount necessary to assure confidence in the financial structure of the company and to maintain its credit standing (Bluefield Water Works & Improvement Company v. Public Service Commission, 262 U. S. 679, 692, 43 S. Ct. 675, 679, 67 L. Ed. 1176); (2) the payment of dividends and interest (Pennsylvania Power & Light Company v. Public Service Commission, supra, 128 Pa. Superior Ct. 195, 211, 212, 213, 193 A. 427); (3) amount of the investment, the size and nature of the utility, its risks, and the circumstances attending its origin, development, and operation (Solar Electric Company v. Pennsylvania Public Utility Commission, 137 Pa. Superior Ct. 325, 387, 388, 9 A. 2d 447)": *Wall v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 35, 46, 47, 125 A. 2d 630, 636, 637. There may be other factors which may enter into the determination of rate of return. Many items such as the financial structure, the credit standing, dividends, interest, the attendant risks, regulatory lag, wasting assets are naturally considered in determining the cost of capital. In weighing these factors, the commission exercises its judgment as to cost of capital. However, this judgment must be exercised upon the facts as they have been presented. See *City of Pittsburgh v. Pennsylvania Public Utility Com-*

*mission,* 171 Pa. Superior Ct. 187, 210, 90 A. 2d 607. If there is no evidentiary basis in the record, a factor may not be considered as a matter of policy or for desired flexibility in administrative procedure (*Aizen v. Pennsylvania Public Utility Commission,* 163 Pa. Superior Ct. 305, 316, 60 A. 2d 443; *Noerr Motor Freight, Inc. v. Pennsylvania Public Utility Commission,* 181 Pa. Superior Ct. 322, 336, 124 A. 2d 393) ; and if supported by the evidence and once considered and applied it cannot support a further exercise of judgment. To do so would amount to the granting of a mere gratuity. In *Scranton-Spring Brook Water Service Co. v. Public Service Commission,* 119 Pa. Superior Ct. 117, 140, 181 A. 77, 87, we disapproved of the practice of making an over-all percentage allowance for going concern value, and referring to such arbitrary allowance we stated : " 'It becomes a bonus pure and simple. . . . It constitutes rank imposition upon the public and cannot be called in any sense "fair value." ' " The principle is equally applicable to the issue before us.

We are convinced that if this allowance above the cost of capital in the present proceeding were approved, rationalized as one made upon the exercise of the commission's good judgment, it will follow that by gradual increases in the amount of such allowance there could ultimately be sustained a finding of the entire rate of return supported merely by "judgment." As a matter of fact, on April 2, 1934, this is what the Public Service Commission attempted to do. Because of the prevailing economic conditions, it passed a resolution fixing the reasonable rate of return for all utilities at 6 per cent. In *Scranton-Spring Brook Water Service Co. v. Public Service Commission,* supra, 119 Pa. Superior Ct. 117, 146, 181 A. 77, and in *Pennsylvania Power & Light Company v. Public Service Commission,* supra,

128 Pa. Superior Ct. 195, 213, 193 A. 427, we disapproved such arbitrary method and reiterated the rule that the rate of return must be based upon the circumstances of each case as indicated by the facts in the record. Consequently, if the commission cannot establish the entire rate of return in the exercise of its own judgment, it certainly cannot fix a part of the rate of return on judgment alone. The mere recital that the judgment allowance is "Based on our knowledge of natural gas utility operations generally in Pennsylvania, and respondent's operations in particular, and considering the usual fluctuations in the security markets, as well as the then (1953-1954) violent fluctuations in the bond market," does not cure the basic defect. The commission could make this statement in any case to support the exercise of its discretion notwithstanding the absence of substantial evidence in the record for factual findings to sustain its conclusions. The commission does not attempt to point out upon what general knowledge of natural gas operations in Pennsylvania or upon what operations of Manufacturers in particular its order could be based, or in what manner, if any, these considerations affect the rate of return in this case; the processes and methods by which the commission reached its finding and conclusion concerning the allowance of .19 per cent above the cost of capital as having basis in these general considerations have not been disclosed. See *Scranton-Spring Brook Water Service Co. v. Public Service Commission*, supra, 119 Pa. Superior Ct. 117, 123, 181 A. 77; *Ruettger v. Pennsylvania Public Utility Commission*, 164 Pa. Superior Ct. 388, 391, 392, 64 A. 2d 675. The reasons advanced by the commission in this case in support of the allowance above the cost of capital lack support in the evidence and are without justification

in the law. In the order of October 18, 1955, the commission has merely reiterated its position relative to the exercise of its discretion as set forth in the unacceptable order of August 23, 1954.

In addition to referring to the "possible uncertainties" of the future money market, Manufacturers presented evidence in support of the allowance over the cost of capital under the theory of "attrition of earnings." To state it briefly, this attrition is supposed to occur due to regulatory lag (the inability of a utility to pass on immediately to consumers increased rates because of the necessity to first obtain commission approval which in turn may result in suspension of the new rates pending disposition of the proceedings), and to the constantly increasing operating costs. In the present proceeding the commission specifically rejected this theory as a support of .19 per cent additional above the cost of capital; this was proper as these factors were reflected in the determination of the cost of capital and the allowance for operating expenses. The witness Crissman testified that it was mainly for this purpose that he felt an allowance above the cost of capital was justified. As to the amount of the allowance (¼ to ½ of one per cent) to compensate for attrition of earnings, Crissman's testimony was a mere self-serving statement unsupported by any factual basis or acceptable reason for any allowance. The commission commented as follows: "Respondent also claims rate of return should include an allowance above our cost of capital finding because 'attrition of earnings,' resulting from regulatory lag and constantly increasing operating costs, never permits the utility to actually earn the allowed return. This Commission has repeatedly rejected similar contentions in other prior proceedings, stating in substance that market prices of utility se-

curities reflect informed investors' knowledge of the much publicized regulatory lag in periods of rising costs, and also that assumed increases in wage rates, gas purchase rates, or other costs are matters to be dealt with as expenses based on specific evidence, without making a catchall allowance in rate of return for such assumed future increases in costs."

The commission refers, in support of its action in making an allowance above the cost of capital, to several cases in which an allowance above the cost of capital was affirmed by this Court—*Pittsburgh v. Pennsylvania Public Utility Commission*, 169 Pa. Superior Ct. 400, 82 A. 2d 515 (allowance of .26 per cent above cost of capital) ; *City of Pittsburgh v. Pennsylvania Public Utility Commission*, supra, 171 Pa. Superior Ct. 187, 90 A. 2d 607; *Pittsburgh v. Pennsylvania Public Utility Commission*, 174 Pa. Superior Ct. 363, 101 A. 2d 761 (allowance of .43 per cent over cost of capital). But see *Berner v. Pennsylvania Public Utility Commission*, supra, 382 Pa. 622, 632, 633, 116 A. 2d 738. We do not now hold, nor did we infer in the prior appeal of this case, that the rate of return must be limited to the cost of capital. We specifically said: "Rate of return is not always synonymous with the cost of capital . . ." *Pittsburgh v. Pennsylvania Public Utility Commission*, supra, 178 Pa. Superior Ct. 46, 71, 112 A. 2d 826, 837. However, we do reiterate that a finding as to an allowable rate of return must be supported by substantial evidence. If the only evidence presented concerns those factors normally considered in determining cost of capital, it is by reason of coincidence and not by rule of law that the rate of return is limited to the finding of cost of capital. On the other hand, if substantial evidence on factors not implicit in the determination of cost of capital is presented and these fac-

tors have a bearing on rate of return, the rate of return may then differ from the finding of the cost of capital. In any event, the finding of the rate of return must be supported by proper evidence and cannot be based upon a dual consideration of the same items; it may be above, below, or the same as, the cost of capital.

The commission relies to some extent upon *State Corporation Commission of Kansas v. Federal Power Commission*, 206 F. 2d 690, 721, wherein the Court of Appeals, Eighth Circuit, reversed a finding of a 5½ per cent rate of return for a natural gas company. The court observed that there was substantial evidence produced which had been ignored without explanation by the commission. The case was remanded to the commission with a direction to set out more fully and particularly the facts and reasons bearing on its decision as to rate of return, because "the findings made as to the allowed rate of return are insufficient." We find no inconsistency between that case and the instant case. In the latter the commission accepted rationalization without facts; in the former the commission ignored facts without reason.

The commission seems to indicate in its order that the cost of capital as found does not include an allowance for the underwriting fees and other costs of issuance which would be incurred by Manufacturers if it were to obtain capital on the market separate and apart from Columbia. As we view it, this is purely hypothetical; it is undisputed that all capital for Manufacturers is supplied by Columbia, and that it is not necessary for Manufacturers to seek capital as an individual company. The underwriting costs incurred in obtaining capital for the Columbia system as a whole were part of the cost of capital to Columbia which has been applied to Manufacturers. Whether it might

cost Manufacturers an additional amount to obtain capital is entirely beside the point. Cf. *Solar Electric Company v. Pennsylvania Public Utility Commission,* supra, 137 Pa. Superior Ct. 325, 359, 9 A. 2d 447; *Cheltenham & Abington Sewerage Co. v. Public Service Commission,* 122 Pa. Superior Ct. 252, 261, 262, 263, 186 A. 149.

It is our conclusion on the record before us that there is no more substantial evidence to sustain a finding of rate of return above the cost of capital than there was in the previous record in *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 178 Pa. Superior Ct. 46, 112 A. 2d 826. The argument has been presented that, because of the language in other cases and in articles on the subject, a utility should not be limited to the "bare-bones" cost of capital. We think this is an unfortunate misnomer. A finding of the cost of capital establishes for practical purposes a percentage figure to be used in allowing a return. This does not constitute a finding that in actual amount the utility cannot earn more than it costs to obtain capital. The percentage figure of the cost of capital is applied to the entire rate base. There is thus granted a return equal to the percentage of cost of capital, but it is allowed upon the entire valuation or rate base. For example, in the instant case, the percentage of 6.31 as the cost of capital would be applied to the rate base of $80,000,000 and provide a net return of about $5,048,-000. We find nothing to indicate that this utility or any other utility would raise in any one year an amount of capital equal to the amount of the valuation as fixed by the rate base. The entire Columbia system, consisting of fifteen or sixteen owned subsidiaries including Manufacturers, in the year 1954 marketed only $40,-000,000 of debt capital. It is apparent that a rate of return of 6.31 per cent as applied to Manufacturers'

valuation of $80,000,000[5] will properly provide for capital costs of the business and all necessary requisites covered by rate of return. Moreover, this rate of return is a net figure after allowance for taxes, depreciation, and operating expenses. A gratuity, large or small, added thereto is without justification. It is the function of the commission in fixing a fair rate of return to consider not only the interest of the utility but that of the general public as well. The commission stands between the public and the utility (*Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 169 Pa. Superior Ct. 400, 404, 82 A. 2d 515, otherwise modified in 370 Pa. 305, 88 A. 2d 59); and under the law the commission is charged with the duty of protecting the rights of the public (*Citizens Water Company v. Pennsylvania Public Utility Commission,* 181 Pa. Superior Ct. 301, 307, 124 A. 2d 123). Although the commission, within the limits of the statute, has certain discretionary powers (*Philadelphia v. Pennsylvania Public Utility Commission,* 164 Pa. Superior Ct. 96, 103, 63 A. 2d 391), it is not justified in making any finding as to rate of return to be allowed a utility without substantial and competent evidence presented to support it.

RATE STRUCTURE. The other question involved relates to the rate structure and the reasonableness and lawfulness thereof. In remanding the record for further hearing and findings of fact (*Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 178 Pa. Superior Ct. 46, 72, 112 A. 2d 826), we stated that we were unable to determine on that record whether the rate structure was free from unreasonable and unjust discrimination. It was the contention that the rate structure unduly differentiated between the smaller in-

---

[5] The commission found original cost, after accrued depreciation and depletion, to be $62,845,024.

dustrial consumers and the larger industrial consumers. At the remand hearing additional evidence was presented by Manufacturers, and, if it were not for our conclusion concerning the rate of return, we would now unqualifiedly affirm the rate structure. The schedules were designed to produce revenues under a rate of return of 6½ per cent. On remand the commission again found 6½ per cent to be a fair rate of return and consequently no tariffs with new rate schedules were filed by the utility.

In the prior proceeding we indicated that the rate structure contained seven consumption blocks whereas under the preceding rates there were five, and that the increases for each of the various blocks were not made with any uniformity or with any ascertainable consistency. At the remand hearing Manufacturers' witness, C. A. Massa, supplemented the evidence contained in the prior record as to the form of the rate schedules. He supplied factual details in support of such factors as the recent and past rate history and program of the utility, the sales characteristics of the various classes of consumers, the practicability of administering the schedules, the value of the service to the various consumers, the promotional aspects of the rates, and the competition in certain areas by other fuels. He indicated that the fixed overhead of the utility became progressively lower as the amount of gas used increased, and that the comparative cost of supplying large consumers per unit of gas used was lower than the unit cost of supplying the smaller consumers. He also noted that the larger industrial consumers generally have stand-by facilities whereby they can utilize other fuel if the price factor warrants. A change in the cost per gallon of oil of one cent is comparable to a change of seven cents per MCF of gas, as one MCF

of gas produces the equivalent of seven gallons of oil. Consequently, the rate per MCF of gas for the larger consumers must necessarily reflect this competitive feature. Cf. *Pennsylvania Power & Light Company v. Public Service Commission,* supra, 128 Pa. Superior Ct. 195, 220, 193 A. 427.

The witness also pointed out the higher unit cost of service for residential and commercial consumers resulting from their uneven use of the facilities and testified block by block concerning the specific factors entering into the determination of each rate.

The City contends that the problem of unreasonable discrimination cannot be resolved unless estimates of service are produced for each class of consumers and the cost of service to each class. In passing upon a similar contention in *City of Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 171 Pa. Superior Ct. 187, 215, 90 A. 2d 607, 621, we said: "Section 304 of the Public Utility Law, 66 PS §1144, prohibits only unreasonable discrimination. A mere difference in rates between classes of customers does not establish unreasonable discrimination. *Philadelphia v. Pennsylvania Public Utility Commission,* 162 Pa. Superior Ct. 425, 432, 57 A. 2d 613; *Pittsburgh v. Pennsylvania Public Utility Commission,* 168 Pa. Superior Ct. 95, 102, 78 A. 2d 35. The tariff filed no doubt contains some inequities, but the evidence does not establish unreasonable discrimination." In the prior appeal (178 Pa. Superior Ct. 46, 68, 112 A. 2d 826), we said that the difference in rates between classes of consumers upon the basis of quantity of gas used is permissible and does not necessarily establish unreasonable discrimination.

We are of the opinion that Manufacturers has met the burden of establishing that the changes from the

old to the new rates are fair and are not unreasonably discriminatory. Cf. *Natona Mills, Inc. v. Pennsylvania Public Utility Commission,* 179 Pa. Superior Ct. 263, 271, 116 A. 2d 876.

As the rate structure was designed to provide revenue under a rate of return of 6½ per cent, its affirmance is qualified as it must be revised for the purpose of calculation of refunds based on a rate of return of 6.31 per cent.[6] As Manufacturers' new rate structure became effective January 20, 1956, the calculation will be to determine the amount of refunds in accordance with the stipulation of October 7, 1954.

The order of the commission of October 18, 1955, is, to the extent indicated, set aside, and the record is remanded to the commission for the making of an order for refunds in accordance with the stipulation of October 7, 1954.

----

DISSENTING OPINION BY GUNTHER, J.:

The Manufacturers Light and Heat Company (hereinafter called utility) filed tariff supplements with the Pennsylvania Public Utility Commission providing for proposed increase in total revenue of over $5,800,000. The tariffs would have effected increases in industrial and residential rates and a special increased rate for Lukens Steel Company were suspended by the commission for a period of nine months. Complaints were filed, hearings were held; and, on August 23, 1954, the

---

[6] The commission in its order states that there would be a reduction of $152,000 in the annual allowable return to Manufacturers on the basis of a rate of return of 6.31 per cent; that annual income taxes would be reduced by $133,983; and that the total allowable annual revenues would be reduced by $285,983, or seven-tenths of one per cent.

commission entered an order granting increases totalling some $2,900,000. Several appeals were taken to this court from that order, and, in an opinion dated March 28, 1955, the case was remanded to the commission to take additional evidence and to make further findings of fact in regard to rate structure and fair rate of return. Two judges dissented on the question of rate of return. See *Pittsburgh v. Pa. P. U. C.,* 178 Pa. Superior Ct. 46, 112 A. 2d 826. The commission thereupon held a hearing in June, 1955, at which additional testimony was taken. On October 18, 1955, the commission entered a new order from which the City of Pittsburgh has taken this appeal.

In its order of August 1954, the commission authorized a rate of return of 6½ per cent. This was based largely on a finding that the cost of capital to Columbia Gas System (the utility's parent company from which the utility secures financing) was between 6.05 and 6.31 per cent. An allowance was added thereto for risks and possible fluctuations in the financial market. In the opinion reversing and remanding on this issue it was stated, at page 69: "In arriving at a fair rate of return the commission assumed, and it was not disputed, that the cost of capital to Columbia Gas System, Inc., was identical with the cost of capital to the utility (Manufacturers). On this point the commission stated: 'To summarize, reasonable capital cost rates applicable to Columbia and respondent are for debt capital, 3.09 per cent historically and 3.35 per cent on a current basis, and 9.25 per cent for common equity capital. Weighing these cost rates with the average capital structure of Columbia System for the 1949-1953 period, consisting of 52 per cent debt and 48 per cent common equity, results in a composite cost of 605—6.18 per cent. If a balanced capital structure

were applied, the composite cost range would be 6.18—6.31 per cent. We, therefore, have for consideration in determining fair rate of return a cost of capital within the range of 6.05—6.31 per cent.' Such cost of capital is based on the demands of the investors and fully takes into account the hazards and risks incurred in the business, including the fact that 'wasting assets' are involved. There is no doubt that the utility obtains its necessary capital through Columbia. At the same time it is evident that the cost of capital to the parent company, consisting of many subsidiaries in various states and jurisdictions, is by no means an accurate determination of cost of capital in this proceeding to this utility operating an intrastate business in Pennsylvania".

It was further stated that the commission erred in twice accounting for the risks and fluctuations in the financial market and that the commission's allowance was not based on and supported by the evidence. The order read as follows: "The record is returned to the commission to determine the reasonableness and lawfulness of the rate structure in supplement No. 11 to Tariff Gas—Pa. P. U. C. No. 37, and to determine a proper rate of return. The commission may receive such additional evidence as the circumstances require and make further findings of fact. After such findings the commission shall revise and modify its previous order of August 23, 1954, as may necessarily follow and require proper tariff or tariffs to be filed producing the annual allowable operating revenues".

Pursuant to the order of this court the commission took additional testimony and concluded in its order of October 1955, now under appeal, that its original allowance of 6½ per cent as a fair rate of return was correct. The City of Pittsburgh, appellant, contends

that the new finding of fair return is not supported by the evidence. Appellant objects to the admission of additional testimony, contending that the commission should merely have reexamined the record in light of the opinion and made new findings consistent therewith. However, the remand order specifically empowered the commission to receive additional evidence, which, therefore, was properly done.

The commission in its present order repeated its findings of cost of capital to Columbia Gas System and held that the cost to the utility should be considered the same as to its parent. Appellant objects to relating the utility's cost of capital to that of Columbia, but the record amply justifies the finding that they are the same. In fact the testimony presented at the last hearing indicates that if the utility were required to procure its capital directly and not through Columbia the cost might be well higher, because Columbia is experienced in financial matters, is better able to procure prime rates because of its diversified interests, and because the costs incident to financing are reduced by the group financing accomplished by Columbia for all its subsidiaries.

In making an additional allowance above cost of capital, to reach the finding of fair rate of return of 6½ per cent, the commission did so on the basis of specific testimony as to the necessity for such additional allowance. The reasons therefor are to provide some margin for deviations and fluctuations in the market in respect to cost of capital, to permit the utility to instill confidence in its financial soundness, and to enable it to credit some amount to surplus. As pointed out in the prior dissent, see cases therein cited, such an allowance above the bare cost of capital has been expressly approved by this court.

In the majority opinion it is stated that the additional allowance above cost of capital was error, because, among other reasons, the normal risks and uncertainties of financing had already been considered by the commission in arriving at the cost of capital. The record discloses that the elements of risk and fluctuation were not a factor in the commission's findings of cost of capital. The findings were based on specific testimony as to the actual cost of money to Columbia for representative periods. The utility's cost was equated to the actual findings for Columbia, although the evidence indicates that it actually might be higher. After making findings of cost of capital, the commission then made an additional allowance, for the reasons above outlined. This was proper, and, being supported by sufficient competent evidence, was a reasonable exercise of discretion. It is submitted, therefore, that the commission's finding of 6½ per cent as a fair rate of return was not error and should be affirmed.

WRIGHT, J., joins in this dissent.