United States Steel Corporation, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent—Consumer Education and Protective Association, CEPA, and Philadelphia Electric Company, Intervenors.

Lukens Steel Company, et al., Petitioners *v.* Pennsylvania Public Utility Commission, Respondent—Consumer Education and Protective Association, CEPA, and Philadelphia Electric Company, Intervenors.

Argued June 7, 1978, before President Judge Bowman and Judges Crumlish, Jr., Wilkinson, Jr., Mencer, Rogers, Blatt and DiSalle.

*Henry M. Wick, Jr.,* with him *Charles J. Streiff,* and, of counsel, *Kenneth R. Pepperney,* and *Wick, Vuono & Lavelle,* for petitioner, United States Steel Corporation.

*Henry R. MacNicholas,* with him *Robert H. Griswold,* and, of counsel, *McNees, Wallace & Nurick,* for petitioners, Lukens Steel Company, et al.

*Michael P. Kerrigan,* Assistant Counsel, with him *Daniel F. Joella,* Assistant Counsel, and *Barnett Satinsky,* Chief Counsel, for respondent.

*Andre C. Dasent,* for intervenor, Consumer Education and Protective Association.

*W. Russel Horner,* with him *Ernest R. vonStarck; Kenneth R. Myers; Morgan, Lewis & Bockius;* and

*Edward G. Bauer, Jr.,* for intervenor, Philadelphia
Electric Company.

OPINION BY JUDGE ROGERS, August 9, 1978:
This is a public utility rate case.

On November 19, 1975 the Philadelphia Electric
Company (PECO) filed with the Pennsylvania Pub-
lic Utility Commission Supplement Nos. 51 and 52
to its Tariff Electric—Pa. P.U.C. No. 24, and Supple-
ment Nos. 48 and 49 to its Tariff Utility—Pa. P.U.C.
No. 7[1] to make increases in its rates to become effec-
tive January 18, 1976, subsequently postponed by
PECO to January 21, 1976. The supplements com-
bined proposed rates estimated to produce an increase
in annual operating revenues of $94,835,000 at the
level of operations at August 31, 1975, the end of the
test year. This represented an increase of 9.7% over
then allowed annual operating revenues in the amount
of about $972,238,000. The new claimed annual op-
erating revenues were $1,069,021,000. Supplement to
No. 51 was designed to provide increased annual oper-
ating revenues of about $47,009,944, or 4.8%, based
on operations for the test year ended August 31, 1975;
and Supplement No. 52 was designed to provide an
additional $47,595,511 of revenues, or 4.9%. PECO's
filing proposed that the Supplement No. 51 rates con-
tinue in effect the rate structure approved by the
Commission by order made March 25, 1975 in PECO's

---

[1] Supplement Nos. 48 and 49 to Tariff Utility—Pa. P.U.C. No.
7 applied only to Penn Central Transportation Company, now Con-
Rail. PECO proposed increased rates for this service equal to those
proposed for its class HT (customers supplied high tension voltage
of 13.2 kV and above) and PD (customers served primary voltage
of 4 kV). ConRail's rates were increased by the final order of the
P.U.C. in this case by about the same percentage as those of class
HT and PD. All references to Supplement Nos. 51 and 52 include
the parallel Supplement Nos. 48 and 49. ConRail did not participate
in this case.

immediately preceding rate case at P.U.C. docket RID 129,[2] applying a level increase to all customers of 4.9%.[3] Supplement No. 52 proposed increases of rates to customer classes HT (commercial or industrial customers receiving high-tension voltages of 13.2 kV and above), and PD (commercial and industrial customers served at primary voltage of 4 kV), by 6.9% and to all other classes of customers by 3.4% over the Supplement No. 51 level. Thereafter, many customers, large and small, filed complaints protesting the proposed increases. The Commission ordered an investigation to determine whether either of the supplements should be allowed to become effective without suspension. Hearings were held. On January 20, 1976, after oral argument, the Commission ordered the suspension of both supplements until July 21, 1976 but granted PECO the right to "file tariff supplements, with essentially the same rate structure as presently effective rates, designed to produce an increase in annual revenues not to exceed $24,300,000, provided, however, that there be no rate increase applicable to the first 500 kWh per month usage by residential customers. . . ." PECO then filed Supplement No. 57 to Tariff Electric—Pa. P.U.C. No. 24, effective February 6, 1976 calculated to produce increased annual operating revenues of $24,290,002 or a total in-

---

[2] The final order in the RID 129 case entered on March 25, 1975 allowed increased annual operating revenues in the total amount of $105,000,000 in response to an application filed January 31, 1974 for an annual increase of $136,000,000. The increase approved in RID 129 was a 12% increase in total annual operating revenues. The test year of that case was the year ended June 30, 1974.

[3] The figure 4.9% as the proposed increase to all classes by Supplement No. 51 is that supplied by PECO in "Information Submitted Pursuant to Section IV of The Commission's Rules and Regulation." So also is the figure 4.8% as the amount by which Supplement No. 51 proposed rates exceeded the RID 129 allowance for annual operating revenues.

crease in annual operating revenues of about 2.5% over those previously allowed (in the amount of about $972,238,000). As the Commission's order required, this Tariff resulted in no increase in rates with respect to the first 500 kWh per month usage by residential customers; rates for all residential usage in excess of 500 kWh per month and rates for all customers in all other classes of PECO's customers were increased by about 3.5% (as compared to the composite 2.5% increase) to make up the additional revenues of $24.3 million.

In apparent recognition that PECO urgently needed additional revenue and in order to expedite the hearings necessary to develop a record on which to base a final order, the Commission appointed a Special Examiner, Morris Mindlin, Esq., to conduct hearings and to prepare a proposed order. By about June 29, 1976, the Special Examiner had conducted 27 days of hearings and additional hearing dates had been scheduled. PECO on that date filed a petition to allow the full Supplement No. 51 rates to go into effect on July 21, 1976, the expiration date of its suspension. The Commission assigned the petition to the Special Examiner for recommendation. The Special Examiner filed a comprehensive report recommending that the prayer of PECO's petition be granted and that PECO be permitted to file tariff supplements designed to produce additional annual revenues not to exceed $22,719,942 based upon the level of operations at August 31, 1975 and "applied through a level percentage increase of all customer billing." The Commission by order made July 21, 1976 generally adopted the Special Examiner's recommendation, permitting PECO to file supplements designed to produce additional annual revenues not to exceed $22,719,942, applied as the Special Examiner had recommended by a level percentage increase of all

customer billings, and upon the further proviso that the supplements so filed should not be deemed Commission made rates. PECO filed its Supplement No. 62 to effect the allowance of July 21, 1976. Since the total allowed annual operating revenues, after giving effect to Supplement No. 57, were $996,528,000, Supplement No. 62 filed in response to the Commission's July 21, 1976 order for increases in the amount of about $22,720,000 represented an increase of about 2.3%. This was applied to all customers evenly.

The Special Examiner filed his final report on August 31, 1976. The bare bones of this report were findings of total allowable annual operating revenues at the level of operations at August 31, 1975 of $1,060,588,000, allowing for a total annual increase of $86,402,000 in revenues, or 91.1% of the $94,835,000 proposed by PECO. The Special Examiner recommended and indeed strongly urged the Commission to allow the total increase of annual operating revenues to be applied as PECO had proposed.[4] The Special Examiner noted that the Commission had in August 1976 initiated an investigation into the necessity, propriety and advisability of making changes in the rate structures of electric utilities, the basis of such

---

[4] It will be recalled that PECO had proposed that the Supplement No. 51 increase of about 4.8% should be applied by a level increase of all customers' billings by this amount and that the Supplement No. 52 increase of an additional 4.9% should be applied by increasing HT and PD customers' rates by 6.9% and all other customers' rates by 3.4% over the Supplement No. 51 level. We may fairly assume that the Special Examiner's recommendation was that the increases allowed by the Commission's orders of January 20, 1976 and July 21, 1976 totalling about $47,000,000, the approximate amount of Supplement No. 51, should be applied evenly to all customers and that the difference between that total and his recommended total allowance of $86,402,000 amounting to about $39,400,000 should be applied at the percentages proposed by PECO in Supplement No. 52—6.9% to HT and PD and 3.4% to all other customers.

structures and the basic policy relating to changes in structures and the rules necessary to implement such changes found to be necessary, proper or advisable. He concluded that the Commission should not exempt any usage from the effect of the increased allowance indicated in this case but that any such action should await the completion of the investigation.[5] He therefore recommended that the Commission by its final order should apply the total allowed additions in revenues to all customers in accordance with PECO's suggestion. He suggested to the Commission that it annul its action of exempting the first 500 kWh per month residential usage from the increase allowed by its order of January 20, 1976.

By order adopted October 13, 1976, the Commission continued the then effective rates—that is, those created by its orders of January 20, 1976 allowing additional annual revenues of $24,300,000 and those permitted, but not as Commission made rates, by its order of July 21, 1976 in the additional amount of $22,719,942—as temporary rates authorized by Section 310 of the Public Utility Law, Act of May 28, 1937, P.L. 1053, *as amended*, 66 P.S. §1150. By the same order the Commission directed PECO to defer the effectiveness of proposed Supplements Nos. 51 and 52.

On February 3, 1977, the Commission adopted its final order.[6] It accepted many of the Special Examiner's findings with respect to the staples of rate determination, such as fair value, fair return, income

---

[5] The fruits of the investigation was the report published in December 1977, called Generic Rate Structure Investigation referred to hereinafter in the text of this opinion.

[6] The Commission entered a corrected final order on April 21, 1974. The corrected final order makes some changes in internal figures displayed in the text but effected no change in the amount of additional annual revenues allowed.

available for return, depreciation, taxes, other operating expenses, and operating revenues; it disagreed with others. The net effect of the changes made by the Commission was unfavorable to PECO. It found the allowable annual revenues to be $1,046,186,000, an amount about $14,400,000 less than the Special Examiner's figure; it consequently found that the total allowable annual revenues provided an allowable increase of $72,000,000 in annual operating revenues. This last finding contrasts with the Special Examiner's finding of an increase in allowable annual revenues of $86,402,000. The Commission directed PECO to file tariffs containing rates to provide total annual revenues, as allowed, in the amount of $1,046,186,000. This third stage of allowed additional annual operating revenues effected by the Commission's final order was in the amount of about $24,980,000, an increase, expressed by percentage, of 2.49% over the total allowed annual revenues provided by the temporary rate order. For completeness, we record that the $72,-000,000 additional revenues allowed by the Commission was an increase over rates allowed by Order RID 129 of about 7.4%.

The Commission in its final order rejected the Special Examiner's recommendation that no exemption from any of the increase of revenues allowed to be received by PECO should be given any customers in any class of customers. The Commission, as it had with respect to the first increase allowed by its January 20, 1976 order, provided that there should be no rate increase applicable to the first 500 kWh per month usage by residential customers with respect to the additional revenues allowed by its final order, in the amount of $24,980,000. Hence, as the result of the Commission's order of January 20, 1976 and its final order PECO's residential customers were exempted from increases with respect to the first

500 kWh of their use amounting to $49,270,000 of the $72,000,000 additional revenues allowed but required to share equally with other customers with respect to the increase in the amount of about $22,720,000 allowed by the order of July 21, 1976. Except with respect to the exemption of the first 500 kWh of residential usage, the Commission accepted the Special Examiner's recommendation that PECO's suggestion for the allocation of the increases among its customers be accepted. This was, it will be recalled, that the Supplement No. 52 additions to revenue should bear more heavily on the HT and PD customers. PECO's proposal for allocation seems to have been implemented in PECO's Supplement No. 67 filed to effect the allowances by the Commission's final order. According to rough calculations the several supplements filed to effect the increases allowed in this case produced the following results: bills of residential customers using 500 kWh per month or less were increased by about 2.8%; the bills of residential customers who used more than 500 kWh per month were increased 2.8% for the first 500 kWh per month and about 9% for the excess over 500 kWh per month used;[7] the bills of all other customers and classes of customers were increased by about 9%. Other facts relating to the rate structure before and after the tariff filings authorized by the Commission in the proceedings will be recorded in the course of our discussion of the issues raised in the case.

Despite the substantial disparity in the amount of increase applied for, $95,000,000, and the $72,000,000 allowed by the Commission's final order, PECO has not asked for review. The United States Steel Corporation (USS), an HT class customer, and a complainant before the Commission, filed a petition for

---

[7] The total of residential billings on a class basis, not including a subdivision WH (water heating), were increased by about 4%.

review to No. 912 C.D. 1977. Six additional HT customers jointly filed a petition for review to No. 913 C.D. 1977, and we will refer to these parties as the 913 appellants.[8] We consolidated the two petitions for argument and disposition.

The issues raised by the appellants relate exclusively to the Commission's order with respect to the allocation of the increase allowed among PECO's customers that is, to the utility's rate structure as established by the Commission's final order.

USS presents two questions. The first is that of whether the propriety of the allocation of the requested increases among PECO's customers proposed by Supplements Nos. 51 and 52 as applied to USS is supported by sufficient evidence. It will be recalled that the increase in the amount of about $47,000,000 sought in Supplement No. 51 was proposed to be applied to all customers and that the increase in the amount of about $47,600,000 sought in Supplement No. 52 was proposed to be obtained by increasing rates of HT and PD customers by 6.9% and those of all other customers 3.4%. Neither the rates nor the rate structures proposed by the Supplements Nos. 51 and 52 ever went into effect without substantial change. As we have noted, the Commission by its order of January 20, 1976 allowed an increase of $24,300,000 and on July 21, 1976 allowed an additional increase of $22,719,942. The Commission exempted the first 500 kWh monthly of residential use required with respect to the January 20, 1976 increase and the balance was allocated evenly to all customers; it ordered all of the increase allowed by July 21, 1976 order to be charged evenly to all customers. Only the

---

[8] These appellants are Lukens Steel Company, Stauffer Chemical Company, The Celotex Corporation, A. E. Staley Manufacturing Company, Scott Paper Company and Union Carbide Corporation (Linde Division).

increase in the amount of $24,980,000 allowed by the Commission's final order of February 3, 1977 seems to have been allocated in accordance with PECO's Supplements Nos. 51 and 52 that the PD and HT customers' rates should be increased more than those of other customers. Thus, instead of the Supplements Nos. 51 and 52 rates being applied with respect to about one-half of a $94,000,000 increase, they seem to have been finally applied to less than one-third of $72,000,000. Furthermore, the rates which finally became effective by Supplement No. 67 filed in response to the Commission's final order were all affected by the Commission's exemption of the first 500 kWh per month of residential usage with respect to about $49,000,000 of the total increase. USS in its brief inveighs heavily against PECO's proposed uneven distribution of the burden of the increase requested by Supplement No. 52; it does not however disclose the actual effect in numbers of the application of the proposed rate with respect to the final $24,980,000 of increase. We cannot conclude on theory alone that the increase in the rates of HT and PD customers by 6.9% and that of other customers by 3.5% with respect to some part of $24.9 million of PECO's total $1,046 millions of annual revenues, constituted an abuse of the broad discretion of the Commission in approving rate structures. In addition, PECO asserted, with support in the record, that the allocation of the increase sought by Supplement No. 52 would tend to make HT and PD rates more compatible with much higher rates of returns from smaller commercial customers and that large users had been particularly benefited by recently decreased fuel adjustment charges.

The second question is raised by both USS and the 913 appellants, which it will be recalled are also HT customers. They vigorously attack the action of the

Commission in exempting from any burden with respect to about $49,000,000 of the total of about $72,-000,000 of allowed additional annual revenues, the first 500 kWh of monthly usage by residential customers. The appellants say that this action constituted the establishment for the first time in Pennsylvania of so-called lifeline rates.

As is common with most new concepts, there are differences of view concerning the proper definition of lifeline rates. The appellants seem to use the term as denoting rates which implement a socio-economic view, held they say by a majority of the members of the Commission, that poor persons should be relieved of the cost of their utility services and that these costs should be charged to other customers better able to pay.[9] One of the complainants before the Commission, Consumer Education and Protective Association International, Inc. (CEPA), which contended in the proceedings below that no part of any increase in annual operating revenues allowed should be imposed with respect to the first 500 kWh monthly usage by residential customers, used the word lifeline to refer to that amount of electricity needed to provide a minimum level of service to the average residential customer and defined lifeline rates as rates designed to keep the cost to the average residential customer of his lifeline supply of electricity at the lowest level possible by reduction of existing rates or by immunizing it from increases. In a report called Generic Rate Structure Investigation prepared by the Public Utility Commission in December 1977 in response to a Joint Concurrent Resolution of the General Assembly, the Commission described lifeline rates as a concept

[9] We are informed by the record that more than 62% of PECO's residential customers use 500 kWh per month, or less. We are also told, however, that these customers account for only 36 percent of residential sales.

relating to the establishment of special low rates for users of small quantities of electricity. We conclude that the Commission's action with respect to the first 500 kWh of monthly residential use was not the imposition of lifeline rates under any of those definitions but that it was a proper exercise of the Commissioner's flexible limit of judgment in fixing rates.

Inflation and other current economic dislocations have struck the electric production industry with particular force. The cliches of the problem are nevertheless truths: if a public utility is starved for funds, its service will deteriorate; residential customers cannot pay utility bills which are beyond their means; and commerce and industry will not stay where costs prevent profits. Since the interests of the parties to rate cases are in irreconcilable conflict, the Commission's task is difficult indeed. We can agree with the appellants that rate making should not be made more difficult by the employment in the process of personal socio-economic theories or, indeed, any consideration other than of the law and the facts of record. Decisions concerning the kind and extent of subsidy which should be afforded to needy residential customers should, it seems, be left by regulatory agencies and courts to the legislative branch of government, as indeed the Commission seems to have concluded in its Generic Study just mentioned. Certainly there is nothing in Pennsylvania law which now empowers the Commission to require one customer simply to pay another's utility bill; and, as we have mentioned, the utility may not and could not for long be required to provide such subsidy out of its capital. This is not to say, however, that rate structures may not be rearranged from time to time in response to changes in economic conditions—whether general changes or changes especially affecting particular classes of customers. The law presently permits reduced rates to

large industrial and commercial consumers, either because such customers buy a lot of what the utility provides or because they may use another's product if the price factor warrants. *Pittsburgh v. Pennsylvania Public Utility Commission*, 182 Pa. Superior Ct. 376, 126 A.2d 777 (1956). We see no reason why in times of stringency the utility might not propose, and the Commission might not approve, rates for residential users less than the rates which an allocation of large increases in necessary revenues by a strict application of cost of service studies would suggest.

Section 304 of the Public Utility Law, 66 P.S. §1144 prohibits the establishment of rates either affording an unreasonable preference to one person or subjecting another to unreasonable prejudice and in addition prohibits the establishment or maintenance of unreasonable differences in rates between classes of service. The appellants say that the exemption of the first 500 kWh of monthly usage by residential customers with respect to some of the additional revenues allowed violated Section 304. They contend that the Commission's action was contrary to the Commission's own earlier view of its power as not including that of requiring one customer to pay for his less prosperous neighbor's utility service. They also invoke the authority of Superior Court cases which emphasize the importance of cost of service to the fair allocation of rates among classes of customers, citing *Riverton Consolidated Water Co. v. Pennsylvania Public Utility Commission*, 186 Pa. Superior Ct. 1, 140 A.2d 114 (1958); *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 182 Pa. Superior Ct. 376, 126 A.2d 777 (1956); and *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 171 Pa. Superior Ct. 187, 90 A.2d 607 (1952).

The Commission in response to a request by its Staff for amplification of its exemption of the first

500 kWh of monthly usage by residential customers stated that its action was not a departure from established policy, the reference apparently being to its previously expressed view that it had no power to order one class of customers to subsidize another's service. The Commission said rather that its action was based on the fact of record that high consumption customers would receive greater benefit from new generating capacity than low use customers, and on its belief that the allocation of the cost of new generating plant on a coincident peak responsibility basis, as PECO proposed, did not sufficiently recognize the benefits to high consumption customers resulting from decreased running expenses associated with added new generating capacity. There is ample evidence supporting the fact that indeed the new nuclear plants are less costly to operate generally and that resultant reduction in fuel adjustment charges would especially benefit high volume customers.

In *United States Steel Corporation v. Pennsylvania Public Utility Commission*, 37 Pa. Commonwealth Ct. 195, 390 A.2d 849 (1978), we had occasion to review at some length the meaning of Section 304 as applied to rate structure issues. As we there pointed out, the Superior Court cases hold that a mere difference in rates among classes of customers is not a violation of the statute, that prior rate schedules are not res judicata on the question of discrimination or reasonableness of new rates, and that the Commission is invested with a flexible limit of judgment. These being the principles, it is clear that the appellants' charge of a violation of Section 304 has not been made out. As we have noted, the bills of residential customers with respect to their first 500 kWh per month usage were increased by about 2.8%, and the charges with respect to residential customers' usage of more than 500 kWh of monthly usage and of all other classes

of customers were increased by about 9%. These numbers, however, do not tell the whole story. The Tariffs filed in response to the several orders in this proceeding show that residential rates per kWh for the first 500 kWh per dwelling unit were increased from $4.22 to $4.34, or by 12 cents per kWh. The HT energy rates which were, we calculate, about $1.93 per kWh for the first 150 hours of use of billing demand were increased by the orders in this case to $2.13 per kWh, a total increase of about 20 cents per kWh. Thus, while the increase of rates of HT users is in percentage of the former rate three times greater than the increase in the rates of residential customers with respect to the latter's first 500 kWh of monthly use, the residential rate in that category was nevertheless increased in money in an amount equal to about 60 percent of the increase in the HT rate. Further, residential users of 500 kWh per month after the increases were still paying more than twice as much per kWh of use as the HT user. We have been unable to find anything in the appellants' briefs descriptive of the amounts by percentage or in money, of the revenues involved in the exemption of the first 500 kWh of monthly residential use from a part of the total increase allowed. It could well be that the amount is de minimis, as the Commission asserted in its response to the Staff's request for amplification. We point out that the burden of proving that the rates the appellants complain of were discriminatory or unreasonable was on them. *Deitch Company et al. v. Pennsylvania Public Utility Commission*, 204 Pa. Superior Ct. 102, 203 A.2d 515 (1964).

The appellants place great emphasis on a cost to serve study produced by PECO in response to a Commission directive. As PECO's expert rate witness testified, there are many different ways of developing costs to serve data, none of which can be consid-

ered as absolutely precise. PECO's study showed cost to serve and returns on rates charged with respect to its various classes of customers calculated by no less than seven different methods each arriving at different results. The study which was presented during the course of the hearings does not, of course, show the effect of the rates finally approved by the Commission in this proceeding. It does show a full year effect of the proposed Supplement No. 52 rates. It is true that the study suggests that the proposed HT rates provided a better return than residential rates by every method. The difference in favor of the HT rates is however quite small with respect to methods called Non-Coincident Peak—Winter and Average & Excess—Winter. In the calculations used in these two last mentioned methods a considerably larger part of generating plant was allocated to HT use than in the calculations of the other methods. The Commission's order amplifying its final order expresses its view that the allocation of generating plant on Coincident Peak methods did not sufficiently recognize the greater benefits of new plant to high consumption users. This conclusion is, again, one that is peculiarly within the Commission's flexible limit of judgment in fixing rates. We further note with regard to the cost to serve study that the rates charged GS customers, being office, commercial and small industrial customers using secondary service, produced a higher return than that of any other rate, including HT. Also, PECO presented evidence that a substantial part of the proposed increase in annual revenues covered investment costs for additional plant which added about 150 million dollars of original cost. As its witness testified, "It seems reasonable to assign more of this rate increase to those customers who have benefitted more from the decline in the fuel adjustment rate." This evidence, of course, applies as well

to the Commission's exemption from part of the increase of the first 500 kWh of monthly residential use as it does to the uneven allocation proposed by Supplement No. 52, to which the witness was referring.

Finally, the appellants emphasize cost to serve to the exclusion of other factors relevant to the establishment of a reasonable rate schedule. In *Philadelphia Suburban Transportation Co. v. Pennsylvania Public Utility Commission*, 3 Pa. Commonwealth Ct. 184, 196, 281 A.2d 179, 186 (1971), we quoted with approval the following language from a Commission opinion in another case as properly descriptive of the principles applicable to the fixing of reasonable rate schedules:

'There is no requirement that rates for different classes of service must be either uniform or equal or that they must be equally profitable. Differences in rates between classes of customers based on such criteria as the quantity of electricity used, the nature of the use, the time of the use, the pattern of the use, or based on differences of conditions of service, or cost of service are not only permissible but often are desirable and even necessary to achieve reasonable efficiency and economy of operation. Rate structure, which is an essential, integral component of rate-making, is not merely a mathematical exercise applying theoretical principles. Rate structure must be based on the hard economic facts of life and a complete and thorough knowledge and understanding of all the facts and circumstances which affect rates and services; and the rates must be designed to furnish the most efficient and satisfactory service at the lowest reasonable price for the greatest number of customers, i.e., the public generally.'

While cost to serve is important, other relevant factors may also be considered.

The appellants' dependence on the case of *Riverton Consolidated Water Co. v. Pennsylvania Public Utility Commission,* 186 Pa. Superior Ct. 1, 140 A.2d 114 (1958), is misplaced. In that, the only case which we have found in which a court directed the Commission to establish a separate rate for a group of customers, the Commission order which was overturned had imposed upon complaining customers of a water company the cost of a loss of water supply as the result of leaks in the utility's general distribution system which was not connected with the water main which exclusively served the complaining customers. In *Pittsburgh v. Pennsylvania Public Utility Commission,* 178 Pa. Superior Ct. 46, 112 A.2d 826 (1955), and *Pittsburgh v. Pennsylvania Public Utility Commission,* 165 Pa. Superior Ct. 519, 69 A.2d 844 (1949), the Commission simply remanded rate structure issues for further action by the Commission because the court could find no evidence in the record supporting the Commission's findings. None of these authorities provide support for the appellants' suggestions that we order the Commission to provide them with a new, lower rate or that we return the record because the Commission's findings are unsupported by competent evidence.

We believe that there is competent evidence supporting the Commission's factual and administrative finding that the rate structure established by its actions in this proceeding was reasonable.

Order affirmed.

#### ORDER

AND Now, this 9th day of August, 1978, the Commission's Corrected Final Order adopted February 3, 1977 and entered April 21, 1977 is affirmed.