Armco, Inc., Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.
United States Steel Corporation, Intervenor.

Argued September 10, 1980, before President Judge CRUMLISH and Judges WILKINSON, JR., MENCER, BLATT, CRAIG, MACPHAIL and WILLIAMS, JR. Judge ROGERS did not participate.

*F. Bruce Abel,* with him *Robert J. White, Steer, Strauss, White & Tobias,* of counsel, *John A. DiNardo,* Assistant Counsel, for petitioner.

*William T. Hawke,* Assistant Counsel, with him *Steven A. McClaren,* Deputy Chief Counsel, and *George M. Kashi,* Chief Counsel, for respondent.

*David M. Barasch,* Assistant Consumer Advocate, with him *Henry M. Wick, Jr.,* and *Charles J. Streiff,* for intervenor.

OPINION BY JUDGE CRAIG, November 14, 1980:

Armco, Inc. petitions for review of the October 6, 1978 order of the Pennsylvania Public Utility Commission (PUC) allowing Duquesne Light Company (Duquesne) an increase of approximately $81.6 million in annual revenues over revenues allowed as of June 30, 1976. Armco's appeal relates solely to the manner in which the PUC allocated that increase among the several classifications of Duquesne's customers, i.e., the rate structure.

The history of this case is as follows:

In October, 1976, Duquesne filed a supplement to its then current tariff, designed to generate approximately $127.9 million in additional revenues, an increase of about 31.6%. Contemporaneously, Duquesne filed a petition for emergency rate relief of some $87.3 million. In both the supplement and the emergency petition, Duquesne proposed to spread the increased revenues evenly over all its customer classes, thus continuing the relative rate structure existing under the current tariff. Under this method, which we will refer to as the uniform method, the base rates of each customer class would increase by roughly the same percentage.

On December 9, 1976, the PUC suspended Duquesne's supplement and instituted a rate investigation of the proposed increase. Simultaneously, the PUC permitted Duquesne to file an emergency tariff supplement designed to generate $60 million annually above the revenues then allowed; however, this $60 million was to be spread over the several customer classes in the following manner: 25% (or $15 million) was to be allocated within the residential class; 30% (or $18 million) within the commercial; 44% (or $26.4 million) within the industrial; and 1% (or $600,000) within other classes. These percentages correspond roughly to the proportion of Duquesne's total electrical output consumed by each customer class. We shall call this method of allocation the consumption method.

On June 28, 1977, the PUC amended its December 1976 order to require that Duquesne amend its rates to levels generating no more than $12 million annually over the rates in effect on June 30, 1976,[1] with the increased charges to be allocated according to the uniform method. By order of September 15, 1977, those rates were designated temporary rates pending the final outcome of the rate investigation.

On December 22, 1977, the PUC adjusted the temporary rates by allowing Duquesne to file tariffs designed to generate $50 million in revenues over those allowed as of June 30, 1976;[2] the uniform method was employed for allocation of that allowance.

---

[1] This amendment was entered because Duquesne's sales of electricity for the period from December 1976 through June 1977 exceeded sales projections contemplated at the time the December 1976 order issued.

[2] The order authorized Duquesne to file tariffs which would generate $44 million in additional revenues, or $50 million if Duquesne would waive all claims for recoupment. Duquesne adopted the latter course.

In its final order of October 6, 1978, the PUC determined that Duquesne had demonstrated a need for a total of about $81.6 million in annual revenues over those allowed as of June 30, 1976;[3] thus the particular effect of this final order, taking into account the $50 million increase authorized by the December 22, 1977 order, was to allow an additional $31.6 million over the revenues to be generated under the tariffs filed in response to that December, 1977 order.

The order provided that this final increment of $31.6 million was to be apportioned among Duquesne's customers on the basis of the relative consumption of each rate schedule during the test year.[4]

The consumption method thus adopted by the PUC for the allocation of the $31.6 million increment is the only element of the PUC's order which Armco presents to us for review. Armco asserts that the PUC's adoption of that method and the departure from the existing rate structure are without support in the record.

The principles of rate structure classification have been ably reviewed and recapitulated by Judge ROGERS in *United States Steel Corp. v. Pennsylvania Public Utility Commission*, 37 Pa. Commonwealth Ct. 173, 390 A.2d 865 (1978) *(United States Steel I)* and

---

[3] By this order, Duquesne would have been allowed to file tariffs generating some $90 million in additional revenues if recoupment was waived. Duquesne declined to do so and adopted the alternative of approximately $81.6 million in additional revenues, retaining its claims for recoupment.

[4] The PUC's December 9, 1976 order specified the percentages of the increase to be distributed over each of four classes; in its October 1978 order, the PUC pointed out that Dequesne bills customers according to varied rate schedules and not by classes as delineated in the 1976 order. The allocation by consumption according to rate schedule is more precise than that by class consumption, although the theory and ultimate effect are substantially the same.

its companion case *United States Steel Corp. v. Pennsylvania Public Utility Commission*, 37 Pa. Commonwealth Ct. 195, 390 A.2d 849 (1978) *(United States Steel II)*; reiteration here is not necessary.

The rationale behind the PUC's action, as revealed in its detailed opinion of February 9, 1979, was that the cost-of-service studies and proposed allocation submitted by Duquesne did not adequately reflect the benefits derived from the startup of Duquesne's Beaver Valley No. 1 nuclear generating facility and the availability of the Bruce Mansfield No. 1 fossil-fuel plant. The theory was that reductions in fuel adjustment clause (FAC) and purchased power expenses of the utility, because those expenses are generally recovered through charges related to the volume of customers' consumption, will inure to customers in relation to their consumption; thus high volume customers will realize the greatest savings in absolute dollar terms.

Armco does not attack the premise, implicitly recognized and approved in *United States Steel I, supra,* that such disparity in the benefits realized by various customer classes may justify allocation of rate increases over the several customer classifications in a manner not uniform as to percentage of increase applied.

The pivotal question is thus whether the record reveals an adequate factual foundation for the manner in which the PUC applied that theory in the present case.

Initially, Armco argues that the record contains no testimony comparable to that which this Court quoted in *United States Steel I, supra,* to the effect that it is reasonable to allocate more of a rate increase to those customers deriving the greatest benefit from decreases in utility expenses. The presence or absence of such a declarative statement verbatim

in the testimony is not crucial if the factual base is present in some terms.

We hold that there is substantial factual foundation in this record for the PUC's decision to allocate $31.6 million of the $81.6 million in additional revenues on the basis of consumption. The PUC's February, 1979 opinion recites, from record facts, that the *net* effect of the output of Beaver Valley No. 1 (nuclear) and Bruce Mansfield No. 1 (fossil) is a reduction of 1,895 megawatt hours of fossil generation. Armco does not challenge that conclusion nor the conclusion that Duquesne's FAC expenses, and therefore FAC charges to customers, will decline by more than $15 million as a result.

Similarly, Armco takes no issue with the PUC's determination that the availability of those two plants will decrease Duquesne's purchased power expenses by some $19.5 million. Because 94% of purchased power expenses are, like FAC expenses, allocated in relation to the volume of consumption, consumption-related charges to customers will decrease by some $18.3 million as a result of the decrease in purchased power.

Accordingly, because of the combined impact of Beaver Valley No. 1 and Bruce Mansfield No. 1, consumption related charges to Duquesne's customers will decrease by more than $33 million.

The general service classes, i.e., commercial and industrial, alone will realize more than $25 million of this rate relief;[5] by contrast, those classes will bear

---

[5] The general service classes consume 77% of Duquesne's output, and therefore will realize 77% of reductions in FAC expense charges: .77 x $15 million = $11.5 million. Also, those classes will realize 77% of the reductions in the portion of purchased power expenses recovered by consumption related charges: .77 x $18.3 million = $14 million. Thus the benefit to the general service classes alone is at least $11.5 million + $14 million = $25.5 million annually.

less than $25 million of the $31.6 million allocated by the consumption method.[6]

Although the figures recited by the PUC do not purport to be a mathematically rigorous equation of costs and benefits, we are mindful that the PUC is invested with a flexible limit of judgment, *United States Steel I* and *II, supra,* and we are not persuaded that it has been exceeded.

Moreover, the burden of proving the allocation to be unreasonable or unduly discriminatory is on Armco here. *United States Steel I, supra,* at 188, 390 A.2d at 872; *Deitch Co. v. Pennsylvania Public Utility Commission,* 204 Pa. Superior Ct. 102, 203 A.2d 515 (1964). As noted above, Armco has asserted only that the allocation is unsupported by the record; it has neither alleged nor made any argument that the ultimate classifications or rates resulting from the PUC's order are unreasonable or discriminatory.[7]

Accordingly, we will affirm.

## Order

And Now, this 14th day of November, 1980, the October 6, 1978 order of the Pennsylvania Public Utility Commission, at R.I.D. No. 373, is affirmed.

---

[6] .77 x $31.6 million = $24.3 million.

[7] We observe that with respect to the $31.6 million, the PUC in effect employed no classification or segregation of customers; rather, the PUC treated all customers homogeneously. We note that, although classifications may be based on the quantity of a utility's output consumed as well as other factors, *Philadelphia Suburban Transportation Co. v. Pennsylvania Public Utility Commission,* 3 Pa. Commonwealth Ct. 184, 281 A.2d 179 (1971), a "large volume of use of a utility's produce alone does not entitle [a] customer to a preferred rate." *United States Steel II, supra,* at 210, 390 A.2d at 857. This is as true of this disputed portion as it is of Duquesne's total revenues.