United States Steel Corporation, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Consumer Education and Protective Association International, Inc., (CEPA) et al., Intervenors.

Lukens Steel Company et al., Petitioners *v.* Pennsylvania Public Utility Commission, Respondent.

Consumer Education and Protective Association International, Inc., (CEPA) et al., Intervenors.

172

Argued September 16, 1981, before President Judge CRUMLISH, JR. and Judges ROGERS, BLATT, WILLIAMS, JR. and CRAIG.

*Kenneth R. Pepperney,* with him *Wayne L. Emery,* of counsel: *Henry M. Wick, Jr.,* and *Charles J. Streiff, Wick, Vuono & Lavelle,* for petitioner, United States Steel Corporation.

*Edward J. Riehl, McNees, Wallace & Nurick,* for petitioners, Lukens Steel Company et al.

*Albert W. Johnson, III,* Assistant Counsel, with him *Steven A. McClaren,* Deputy Chief Counsel, and

*Joseph J. Malatesta, Jr.,* Chief Counsel, for respondent.

*Mark B. Segal,* for intervenors, CEPA, ACORN, and Action Alliance of Senior Citizens of Greater Philadelphia.

*Walter R. Hall, II,* with him *Robert H. Young* and *Susan L. Gordon, Morgan, Lewis & Bockius,* and of counsel: *Edward G. Bauer, Jr.,* for intervenor, Philadelphia Electric Company.

*Michael P. Kerrigan, Pepper, Hamilton & Scheetz,* for intervenor, Delaware Valley Hospital Council.

*Martha W. Bush,* Assistant Consumer Advocate, with her *Walter W. Cohen,* Consumer Advocate, for intervenor, Consumer Advocate.

OPINION BY PRESIDENT JUDGE CRUMLISH, JR., February 17, 1983:

In this consolidated proceeding, United States Steel Corporation, Lukens Steel Company, The Celotex Corporation, Union Carbide Corporation and a number of intervenors[1] petition this Court for review of the October 14, 1980 order of the Pennsylvania Public Utility Commission (Commission) at No. R-79060865 which affirmed and clarified the Commission's May 9, 1980 order. The Commission's orders allowed a portion of a rate increase by the Philadelphia Electric Company (PECO) but exempted from any increase the first 500 kwh of residential usage. The exemption provision is herein challenged.

---

[1] Intervenors include the Consumer Education and Protective Association International, Inc. (CEPA), Association of Community Organizations for Reform Now (ACORN), Philadelphia Electric Company (PECO), the City of Philadelphia, the Office of Consumer Advocate, and the Delaware Valley Hospital Council.

HISTORY OF THIS CASE

On July 27, 1979, PECO filed with the Commission Supplement No. 6 to Tariff Electric—Pa. P.U.C. No. 25, effective September 29, 1979. By order of August 14, 1979, an investigation was instituted to determine the lawfulness, justness and reasonableness of the proposed rates. PECO's rate request was designed to produce revenue increases of $122,731,000 or 10.9% of base rate revenues based upon the future test year ending March 31, 1980. Following twenty-nine days of evidentiary hearings, Administrative Law Judge (ALJ) Joseph J. Klovekorn recommended a grant of $79,871,000 in added revenues, 7.1% of base rate revenues, or 65% of PECO's requested increase.

On May 9, 1980, the Commission entered an Order at R-79060865 granting PECO an estimated revenue increase of $88,813,000, 7.9% of base rate revenues, or 72% of PECO's request. In order to simplify its May 9, 1980 order, the Commission only addressed the ALJ's conclusions with which it disagreed and adopted those conclusions of the ALJ with which it agreed and adopted the remainder of his opinion.

In the May 9, 1980 order, the Commission exempted from any increase "the first five hundred (500) kwh of consumption for Rate R and Rate R-H . . . from any increase."[2] The Commission, relying upon this

---

[2] *Rate-R*—is residential service supplied to dwellings, *i.e.*, a single private family, for the domestic requirements of its members when such service is supplied through one meter.

*Rate R-H*—is residential heating service supplied to dwellings, *i.e.*, a single private family for the specific types of electrical space heating when such service is supplied through one meter.

*Rate H-T*—is high-tension power, *i.e.*, untransformed electrical service from PECO's standard high tension lines, where the customer installs, owns, and maintains any transforming, switching and other receiving equipment required.

Court's decision in *United States Steel Corp. v. Pennsylvania Public Utility Commission (U.S. Steel II)*, 37 Pa. Commonwealth Ct. 173, 390 A.2d 865 (1978), exempted the first 500 kwh of residential monthly usage from the instant rate proceeding

> on the basis that high consumption customers would receive greater benefit from new generating capacity than low use customers. We also concluded that the cost of newer generating plant, allocated on a coincident peak responsibility basis, does not afford adequate recognition of the benefits that accrue to high consumption customers as a result of decreased operating expenses associated with added new generating capacity.

(May 9, 1980 Commission op. at p. 49.) The Commission, in continuing the 500 kwh exclusion concept first approved in *U.S. Steel II*, went on to say in its order:

> In the instant proceeding, the same rationale is still appropriate, because the Company will be able to utilize the newer plant (which has been included in rate base in this case) during the period when the rates will be in effect.
>
> We are also aware that in adopting major portions of the ALJ's recommended decision we have rejected the application of the concept of lifeline rates. We do not believe that the exclusion of an increase to the first 500 Kwh of residential consumption violates our rejection of lifeline rates, but rather is a policy decision founded upon the same type of record facts which existed at R.I.D. 129 and R.I.D. 295 [U.S.

---

*Rate PD*—is Primary Distribution power, *i.e.*, untransformed electric service from the primary supply lines of PECO's distribution system where the customer installs, owns and maintains, any transforming, switching, and other receiving equipment required.

Steel II]. The portion of the increase in rates for consumption above 500 Kwh, resulting from not increasing the first 500 Kwh, will serve as a price signal to decrease consumption, thereby stimulating conservation efforts.

(May 9, 1980 Commission op. at p. 49.)

On June 4, 1980, after entry of the Commission's order, certain industrial complainants[3] filed a petition for reconsideration of the Commission's May 9, 1980 order "to the extent that this order exempts from any increase in rates the first 500 kwh of residential usage and prohibits implementation of a customer charge for residential electric service."

Essentially, the industrial complainants averred in their petition for reconsideration that that portion of the total "across-the-board" rate increase which would have been allocated to the residential customer, as recommended by the ALJ, would in fact be redistributed among all the classes of kwh consumers. The petitioners, in seeking reconsideration, argue that the "transfer" is inconsistent with the rest of the order, unsupported by the evidence, discriminates against non-residential customers and sought an amendment to include the residential class in the rate increase.

On October 9, 1980, a public hearing on the petition for reconsideration was held. On October 14, 1980, the Commission affirmed its prior order to exempt from rate increase the first 500 kwh of monthly residential usage. In its October 14, 1980 order, the Commission addressed those specific objections of the petitioners.

---

[3] The petition for reconsideration was filed by industrial complainants Lukens Steel Co., The Celotex Corp., and Union Carbide Corp. The industrial complainants' comprehensive petition for reconsideration encompasses seven objections to the Commission's May 9, 1980 order, those objections being the basis for the present petitions for review.

DISCUSSION AND THE LAW

As to the petitioners' objections to the 500 kwh residential exclusion as a conservation methodology, the Commission wrote:

> Residential consumption below 500 KWH per month excludes all but a minor air conditioning load. Regarding the conservation of electricity related to the air conditioning load, CEPA, ACORN and AASC in their Reply Brief properly recognize:
>
> A review of the monthly rate table for rate R shows that there is an inverted rate during the summer months, but that during the winter the rate is virtually flat (5.53¢ per KWH for the first 500 KWH and 5.57¢ per KWH for additional KWH....
>
> . . . .
>
> The 500 Kwh exemption creates an inverted rate during the summer which has the effect of promoting conservation by sending the correct price signal.
>
> We have not limited the responsibility for conservation of electricity related to air conditioning in the residential class, in that we directed that the amount of the increase that would have been recovered from the first 500 KWH of monthly residential consumption be allocated to *all* classes of customers.

(October 14, 1980 Commission op. at pp. 2-3.) Regarding construction financing and rate subsidization, the Commission stated:

> It is further noted that Respondent's vice-president of finance testified that one of the reasons for the rate increase is to have earnings and an interest coverage ratio that will allow Respondent to continue to finance its construc-

tion program, thereby providing additional generating capacity. Certainly, those residential customers utilizing 500 Kwh per month are not causing the need for the additional generating capacity. OCA properly recognizes in its brief that:

To the extent that PECO's rates reflect an average energy cost, cost subsidies are occurring through the energy clause. More importantly, to the extent that the industrial customers are using large volumes of energy in their tail block rate which is lower than the incremental energy cost to the Company, i.e., the PJM system lambda cost, then other customers (through the energy clause) are subsidizing this lower than cost energy rate to industrial customers.

(October 14, 1980 Commission op. at p. 3.)

United States Steel asserts that the 500 kwh residential exemption requires it to pay an unreasonable and therefore discriminatory rate for electricity. It bases this assertion on a conclusion that the Commission had previously adopted, and was thus bound by, PECO's cost-of-service study. However, the Commission stated:

We have *not* "adopted" Respondent's cost of service study. . . . [W]e have *modified* the finding of the ALJ that the cost of service study be adopted, to the extent that we excluded a rate increase to the first 500 KWH of residential consumption and allocated that increase to *all* classes, including the segment of the residential class consuming over 500 KWH monthly. In conclusion, USS's contention, that the 500 KWH exclusion is in violation of the Public Utility Code, is without merit.

. . . .

Because the construction of a cost of service study is not an exact science, and because there are no precisely right or wrong cost allocation methodologies, it is too simplistic an exercise to adopt or reject a particular cost of service study. Furthermore, a cost of service study is merely one tool that may be used in determining an appropriate rate design. We have consistently recognized this principle regarding rate design determinations; for example, in the prior Philadelphia Electric Company rate proceeding at R.I.D. 438, we stated:

While we recognize that cost of service is always an important and normally the primary basis of pricing, it is not the only consideration. In the first place, even though the cost of service studies may be done in a craftsmanlike manner, this does not mean that they can be blindly relied upon. Judgment and some assumptions must be made in cost of service studies; cost of service studies are not perfect or precise. In addition, cost-based principles of rate making may be tempered by social considerations and the desire to avoid abrupt changes in existing rate patterns and cost levels. Non-cost factors such as the ability of various customer classes to pay, ability to pass on the utility costs, and value of service, should be taken into consideration.

The Pennsylvania Commonwealth Court recognizes also that factors other than a cost of service study may be considered when determining the allocation of a rate increase. In United States Steel Corporation v. Pennsylvania Pub-

lic Utility Commission, 37 Pa. Commonwealth Ct. 173, 186, 390 A.2d 865, 871 (1978) [U.S. Steel II] the Court stated:

We see no reason why in times of stringency a utility might not propose, and the commission might not approve, rates for residential users less than the rates which an allocation of large increases in necessary revenues by a strict application of cost of service studies would suggest.

While recognizing there are many infirmities inherent in a cost of service study, in particular, we agree with the OCA's contention that Respondent's cost of service study excessively classifies common costs associated with the minimum distribution grid as customer costs, rather than demand costs. Consequently, Respondent's cost of service study overstates the revenue requirement responsibility of the residential class. We have recognized this shortcoming of Respondent's cost of service study by requiring a portion of the revenue foregone due to the KWH excluded from increase in the residential class, to be recovered, in part, from the non-residential classes of service.

(October 14, 1980 Commission op. at pp. 4-6; emphasis in original.)

As to class group rates of return, the Commission reiterated its position as follows:

[W]e adopted as a starting point a compromise approach which, according to Respondent, moves class returns closer to the system average, and then we modified that approach with the condition that, ". . . the first five hundred (500) Kwh of consumption for Rate R and Rate R-H be excluded from any increase." Although

in certain instances it may be desirable to move class rates of return closer to the system average rate of return, it is not this Commission's position that all customer classification ultimately contribute identical rates of return.

(October 14, 1980 Commission op. at p. 6.)

The last assignment for the Commission's reconsideration order relates to the Industrial complaint that residential usage up to 200 kwh is offered below cost and that residential usage of less than 1,250 kwh provides a rate which fails to give a rate of return equal to the system average return. After noting that a rate of return below system average is not necessarily service below cost, the Commission said that "[a]fter consideration of the imprecise nature of cost of service studies discussed previously, coupled with the record evidence in this proceeding, we are *not* convinced either of these contentions are accurate." (October 14, 1980 Commission op. at p. 6; emphasis in original.)

Our scope of review in this kind of an appeal from a Commission order is a determination of whether constitutional rights have been violated, an error of law has been committed or the findings or order of the Commission are not supported by substantial evidence. The question presented to us then is whether the Commission's structuring of rates is a reasonable exercise of the Commission's discretion if it is based upon substantial record evidence and in accord with the legislative mandates of the Code.

We are mindful that "the establishment of a rate structure is an administrative function peculiarly within the expertise of the Commission. . . . [Q]uestions . . . concerning the reasonableness of rates and the difference between rates are factual questions for the Commission whose findings must be upheld if supported by competent evidence." *United States Steel*

*Corp. v. Pennsylvania Public Utility Commission*, 37
Pa. Commonwealth Ct. 195, 211, 390 A.2d 849, 857
(1978) *(U.S. Steel I)*.

The United States Supreme Court, in *FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 586 (1942), a case
involving a rate-making commission's adherence to a
particular formula or combination thereof, limited its
scope of review: "If the Commission's order, as applied to the facts before it and viewed in its entirety,
produces no arbitrary result, our inquiry is at an
end." The Pennsylvania Supreme Court, in *Pennsylvania Public Utility Commission v. Pennsylvania Gas
and Water Co.*, 492 Pa. 326, 337, 424 A.2d 1213, 1219
(1980), citing *Natural Gas Pipeline Co.* for the proposition that rate-making bodies are not duty-bound to
follow mathematical formulas, wrote:

> The rate making function consists of a two-step
> process to effectuate the paramount responsibility of fixing "just and reasonable" rates:
> fair valuation of utility property and the ascertainment of a reasonable rate thereon. There is
> ample authority for the proposition that the
> power to fix "just and reasonable" rates imports a flexibility in the exercise of a complicated regulatory function by a specialized
> decision-making body and that the term "just
> and reasonable" was not intended to combine
> the ambit of regulatory discretion to an absolute
> or mathematical formulation but rather to confer upon the regulatory body the power to make
> and apply policy concerning the appropriate
> balance between prices charged to utility customers and returns on capital to utility investors consonant with constitutional protections
> applicable to both.

Thus, where the Commission fashions its design of
rates on substantial evidence in the record in a ra-

tional manner, our review is severely limited and non-judgmental.

The late Judge KRAMER, speaking for this Court in *Philadelphia Suburban Transportation Co. v. Pennsylvania Public Utility Commission,* 3 Pa. Commonwealth Ct. 189, 281 A.2d 179 (1971), and Judge ROGERS, in *U.S. Steel I* and a companion case, *U.S. Steel II,* both ably reviewed the theory and principles of rate structure classification. From those cases emerge these doctrinal principles of rate structure:

(1) that a prior rate is not res judicata on the question of discrimination or reasonableness;

(2) that mere differences in rates between classes of customers does not establish unreasonable discrimination, and

(3) that the agency with the power to fix rates is invested with a "flexible limit of judgment."

*U.S. Steel II,* 37 Pa. Commonwealth Ct. at 205, 390 A.2d at 873.

It will be recalled that PECO had originally requested an across-the-board rate increase of $122,731,-000 or 10.9% of base rate revenues, that the ALJ recommended revenue relief of $79,871,000 or 7.1% of base rate revenues, and the Commission found need for $88,813,000 or 7.9% of base rate revenues, but exempting from any increase the first 500 kwh of residential usage.

Of the $86.8 million[4] allowed for electric tariff No. 25, $46.5 million of that increase was allocated to the HT class. That 10.9% increase is the same amount of

---

[4] The two million dollar difference between the total rate increase $88.813 million and the total electric increase, $86.8 million, is reflected in total revenue requirement for additional revenue for growth adjustment ($.639 million) and revenue from new or transfer customer charge ($1.35 million).

increase the HT class would have experienced had PECO's across-the-board increase been allowed. The R and R-H classes were allocated $11.25 million of the $86.8 million increase or 2.9% increase for both classes. As a result, the HT class which accounts for 50.68% of electrical consumption while contributing 38% of base rate revenues would contribute 39.2% of base rate revenues. For both the rate R and R-H classes, which account for 26.9% of electrical consumption while contributing 34.5% of base rate revenues, the proposed increase would amount to a contribution of 33% to base rate revenues.

Considering kwh dollars, the HT customer would pay 3.43 cents per kwh as opposed to a pre-increase amount of 3.09 cents per kwh. The rate R customer would pay 5.66 cents per kwh as oposed to a pre-rate increase of 5.22 cents per kwh or a 2.53% increase. The rate R-H customer would be subject to a 6.4% increase in rates, paying 4.0 cents per kwh as opposed to 3.76 cents per kwh.

Petitioners, Industrial Class users (PD and HT) of PECO electricity disagree with the Commission's order specifically excluding any increase of the first 500 kwh of residential usage. Specifically, the petitioners allege (1) that the rates resulting from the exclusion of the first 500 kwh of residential usage are unjust and unreasonable as to the non-excluded classes and indeed establish such a difference between classes of service as to be violative of Sections 1301 and 1304 of the Public Utility Code,[5] (2) that the Commission's

---

[5] Section 1301 of the Code provides, in pertinent part, that "[e]very rate made, demanded or received by any public utility . . . shall be just and reasonable, and in conformity with regulations or orders of the Commission." 66 Pa. C. S. §1301. Section 1304 of the Code provides, in pertinent part, that:

No public utility shall, as to rates, make or grant any unreasonable preference or advantage to any person, corpo-

order is unsupported by the evidence of record and (3) that their due process rights were violated because they had not been given a full and fair opportunity to be heard both as to the original order and the later order on reconsideration. Finally, petitioners allege that the Commission has overstepped its legislative mandate by ordering such an exclusion. PECO and the Commission contend that the Commission's rate increase allowances and distribution scheme are reasonable, that they are a proper exercise of the Commission's discretion, and are based upon substantial evidence.

Underlying the disagreement between the parties is the fact that PECO's cost-of-service study and the recommendations of the ALJ differ from the Commission's order. Apparently, the petitioners consider PECO's cost-of-service study to be a non-severable, quantitatively analytical tool which must be adhered. to in its entirety so as not to produce an unreasonable and therefore unlawful result. Stated otherwise, to reach a result at least partially different from that envisioned by PECO's cost-of-service study and the ALJ's recommendation results in a rate structure which produces unreasonable differences between classes in violation of Section 1304 of the Public Utility Code. Moreover, petitioners argue that, because the residential class rate of return is below system average, unintended subsidy results.

Following a thorough review of the record and the law, we are convinced that petitioners' disagreement

ration or municipal corporation to any unreasonable preju-
dice or disadvantage. *No public utility shall establish or
maintain any unreasonable difference as to rates, either as
between localities or as between classes of service. . . . This
section does not prohibit the establishment of reasonable
zone or group systems, or classifications of rates. . . .* 66 Pa.
C. S. §1304.

as to the structuring of PECO's rates by the exclusion of the first 500 kwh of residential usage is a disagreement with the result of a valid judgment of the Commission as to the structuring of rates. *See Armco v. Pennsylvania Public Utility Commission*, 54 Pa. Commonwealth Ct. 542, 422 A.2d 719 (1980); *United States Steel I & II*. We are convinced that the rates ordered by the Commission are "just and reasonable" pursuant to Section 1301 of the Code[6] and are not discriminatory as between classes of service, a violation of Section 1304 of the Code.[7]

Petitioners' reliance upon PECO's cost-of-service study is misplaced. The Commission has allocated, as in *U.S. Steel II*, the greatest portion of the rate increase to those customers who will obtain the greatest benefit from decreases in utility expenses. There is ample evidence in the record to support this limitation:

> [H]igh consumption customers would receive greater benefit from new generating capacity than low use customers. We also concluded that the cost of a new generating plant, allocated on a coincidental peak responsibility basis, does not afford adequate recognition of the benefits that accrue to high consumption customers as a result of decreased operating expenses associated with added new generating capacity. In the instant proceeding, the same rationale is still appropriate, because the Company will be able to utilize the newer plant (which has been included in rate base in this case) during the period when the rates will be in effect.

(May 9, 1980 Commission op. at p. 49.) The ALJ cited the testimony and concluded that "service to Rate HT

---

[6] 66 Pa. C. S. §1301.

[7] 66 Pa. C. S. §1304.

customers is considerably more energy intensive and therefore less capital-intensive than service to residential customers.'' (ALJ opinion at p. 209.) Thus, the rationale in *Armco* as to a reduction in the fuel adjustment clause (FAC) and purchased power expenses, the benefit of which inures to customers as a function of consumption, is sound.[8] High consumption customers enjoy greater dollar per kwh savings where there is greater fuel efficiency. *Armco*, 54 Pa. Commonwealth Ct. at 546, 422 A.2d at 721.

Being mindful of the Commission's discretionary power and considering our limited scope of review, we conclude that there is sufficient evidence in the record to uphold the allocation of $46.5 million of an allowable $88.8 million rate increase to the rate HT class and to exclude from any increase the first 500 kwh of residential usage. Thus, we are unpersuaded by the petitioners' objection to this rate increase.

Petitioners' final objection is a due process argument. This contention is without merit. The Commission did indeed grant reconsideration and responded to the petition. Thus, neither due process nor deviation from the record are valid complaints. The Commission's order of October 14, 1980, is affirmed.

#### ORDER

The order of the Pennsylvania Public Utility Commission entered October 14, 1980 at Docket No. R-79060865, is hereby affirmed.

Judges MENCER and PALLADINO did not participate in the decision in this case.

---

[8] The PUC's recognition of the fuel savings associated with the Peach Bottom nuclear units and the fuel savings associated with the then newly on-line Salem I nuclear plant offer sufficient reason for the Commission's revenue allocation.