University of Pennsylvania, et al., Petitioners *v.* Pennsylvania Public Utility Commission, Respondent.

Argued June 5, 1984, before President Judge CRUMLISH, JR. and Judges ROGERS, WILLIAMS, JR., CRAIG, MACPHAIL, DOYLE and PALLADINO.

*Louis J. Carter,* for petitioners.

*Julian S. Suffian,* Assistant Counsel, with him, *Albert W. Johnson, III,* Deputy Chief Counsel, and *Charles F. Hoffman,* Chief Counsel, for respondent.

*Thomas P. Gadsden,* with him, *Robert H. Young* and *Jack E. Jerrett, Morgan, Lewis & Bockius,* and

of Counsel: *Edward G. Bauer, Jr.,* Vice President & General Counsel, and *Irene A. McKenna,* for intervenor, Philadelphia Electric Company.

OPINION BY JUDGE ROGERS, December 18, 1984:

A number of customers of the Philadelphia Electric Company—Steam Division (the Utility), including the University of Pennsylvania, seek review of an Order of the Pennsylvania Public Utility Commission (the Commission) entered and adopted April 29, 1983. Because the brief in opposition to the Commission order is that of the University of Pennsylvania, we will refer to the petitioners collectively as "the University." The order authorizes the Utility to file tariffs or their revisions or supplements designed to produce annual revenues[1] not in excess of $69,416,000.00, an increase in annual revenues of $4,407,000.00. The Utility proposed by suspended rates to have become effective on September 28, 1982, a revenue increase of $8,363,000.00. An Administrative Law Judge (ALJ) recommended an increase of $3,822,000.00.

Philadelphia Electric Company provides its customers with steam, electric and gas service.[2] Only the first is here at issue. The operations of the Utility's Steam Division encompass a five and one-half square mile area in Central and West Philadelphia. In 1982, 563 commercial and industrial customers were served with 5,094 million pounds of steam primarily for use in space heating. Three steam production facilities, primarily low and high

---

[1] Exclusive of revenues derived from the State Tax Adjustment Surcharge.

[2] Philadelphia Electric, in addition to the provision of steam to commercial and industrial consumers, provides service to some 1.3 million electric and 290,000 gas customers, in a 2,255 square mile area of Philadelphia, Bucks, Chester, Delaware, Montgomery, and York counties.

pressure boilers and plants for water purification, are located along the thirty-six miles of steam distribution mains and laterals constituting the "downtown loop." The Willow and Edison Stations are low pressure steam production facilities located at the eastern end of the distribution loop. Schuylkill Station is a dual purpose plant serving primarily as a source of high pressure steam but also as a source of electric generation. This dual nature of the Schuylkill Station has given rise to a number of the issues in this litigation.

By Order of the Commission[3] adopted September 17, 1982, an investigation was commenced as to the justness and legality of the Utility's proposed increase in annual revenues. The matter was the subject of some twelve days of hearings conducted by ALJ ISADOR KRANZEL producing a voluminous record of exhibits, compilations of data, and 1250 pages of transcribed testimony. The recommended decision of the ALJ issued on March 11, 1983, over seventy pages in length, contains detailed justification for the various determinations as to fair value of the Utility's steam division property, rate of return fairly to be received by the Utility's investors on the value of that property, and operating expenses necessary to be recovered by the Utility. Thereafter, responding to exceptions and cross-exceptions taken to the ALJ's decision and embodying fifty-six pages of discourse and analysis exclusive of explanatory tables, the Commission, on April 29, 1983, entered the decision and order here subject to review.

The Issues

The petitioners divide the many questions here presented into two categories. First, the University

---

[3] Docketed to No. R-822101.

contends that various costs incurred by the Utility and properly attributable to the provision of electric service have been unfairly and unlawfully included in the expenses to be recovered out of steam consumer charges. Specifically, the University here asserts that the Commission's decision is inadequate with regard to its rejection of these allegations of unlawful "cost shifting" and, therefore, that the record must be remanded for further proceedings and the production of a more extensive adjudication.

In addition, the University contends that the Commission erred in its specific determinations, including errors in the allocation of the burden of proof, with respect to the Utility's rate base, operation and maintenance expenses, depreciation schedule, calculation of cash working capital, and claim for necessary fuel inventory. These issues will be considered seriatim.

### I. Cost Shifting From Electric to Steam Consumers.

#### SCHUYLKILL STATION

As indicated above, a number of issues here pressed have their origin in the dual role of the Utility's Schuylkill Station; producing by means of its No. 3 turbine generator both high pressure steam and electricity. Prior to January, 1981, the expenses, including carrying and operating costs, of Unit No. 3 were the subject of an accounting methodology which accomplished an even division of those expenses between electric and steam consumers. Steam consumers were additionally credited for the electric generation provided by the dual operation in an amount which, if the credit had been continued in 1981, would have equalled $1,964,000.00. This credit was calculated with reference to the monthly average Philadelphia area steam generating fuel cost.

In January, 1981, due, in part, to the retirement of the last three low pressure turbine generators at Schuylkill Station, the Utility altered the accounting methodology described above so as to place on steam consumers the whole of the carrying and operating costs of Turbine No. 3 as well as the related boilers and equipment. Additionally, the Utility replaced the "net generation credit" previously available to off-set steam service costs with a reduced "avoided cost" credit calculated with reference to the expense to the Utility in the absence of Unit No. 3 of purchasing additional electric power from the multi-state PJM[4] electric generation pool. The record is less than clear as to the precise effect of these changes. However, it appears to be conceded that increased annual carrying costs alone will be in excess of $2.2 million and that the recalculated credit for electric production will reduce by 25%-45% those intra-utility revenues previously available to offset costs of steam production.

The University does not now directly attack the legality of the Utility's revision of its Schuylkill Station accounting methodology. Rather, it contends that an alternative methology proposed by it received inadequate consideration by the Commission and that we should remand for such consideration.

The University's proffered resolution of the Schuylkill Station expense division issue is predicated on the applicability of provisions of the United States Public Utility Regulatory Policy Act of 1978 (PURPA)[5] which requires compensation to be paid by public utilities to private owners of electric generating facilities (for example, homeowners installing

---

[4] Pennsylvania, New Jersey, and Maryland.

[5] Public Utility Regulatory Policies Act of 1978, §210, 16 U.S.C. §824a-3 (1978).

domestic photovoltaic arrays or wind or water pow-
ered generators) who make excess electricity avail-
able to the utilities' distribution network. PURPA
provides that compensation to such private owners of
generating facilities is to be calculated with reference
to the Utility's capacity and operating cost of provid-
ing electricity by means of the next generation facility
to be placed on line, in the instant case, the nuclear
Limerick facilities. The University asserts that adop-
tion of its proposal would result in annual revenues
to the steam division derived from its electric counter-
part in excess of the revenue increase requested by
the Utility in these proceedings.

The ALJ rejected the University's proposal pri-
marily because the electric power produced by Unit
No. 3 is not a reliable source of electric generation
inasmuch as the electric production of Unit No. 3 is
a functional by-product of steam requirements, which,
in turn, are at the maximum during the winter season
when excess electric capacity is not needed. Peak elec-
tric usage and the commensurate peak electric ca-
pacity requirement of the Utility is during the sum-
mer season when Turbine No. 3 is generally scheduled
for maintenance and is operating at only a nominal
rate. Therefore, the ALJ concluded that it would be
inappropriate to assess electric consumers with a
capacity charge for power produced by Unit No. 3.

The Commission expressly affirmed this rationale
as follows:

> PECO-Steam, in opposing this adjustment
> [use of the co-generation regulation responsive
> to PURPA] argues that the availability of
> Schuylkill Turbine No. 3 has not avoided any
> capacity costs or diminished [the utility's] need
> to invest in any new electric generating facili-
> ties . . . . therefore, [the utility] argues the only
> cost avoided, by virtue of these sales [of elec-

tricity produced by Turbine No. 3] is the price which the Company would otherwise have to pay to purchase power on the PJM Interconnection which is precisely what Electric Operations is being charged at the present time.

. . .

The ALJ has recommended that this adjustment not be made. The University has excepted arguing that it is undenyable [sic] that the Schuylkill Station is available for electric generation purposes even if the steam produced is a by-product.

In order for us to consider the imposition of a capacity charge, it is important that we consider not only the availability of a particular unit, but the ability to utilize that plant as a reliable source of electricity. Although it is entirely possible that the Schuylkill Station Turbine No. 3 could serve primarily as an electric generation facility, with the steam by-product being utilized for Steam Operations, this plant has been dedicated to the production of steam with electricity produced as a by-product. The record before us indicates that the entire Schuylkill Station operates for the benefit of PECO's steam heating customers and its use or non-use is a function of the demand for steam. As such, we shall consider its capacity available for the production of steam, not electricity. Also, we consider the Steam Operations are being appropriately compensated for the electricity produced at this station. Accordingly, the University's exception is denied.

This analysis of the Commission is derived from and amply supported by the expert testimony of Wil-

liam F. Sundermeir, a mechanical engineer and the Utility's Rate Division Supervisor in charge of the cost and load analysis section who testified that the Commission's regulations promulgated in response to PURPA are inappropriate for application to a determination of intra-utility transfer of funds related to the mixed steam and electrical operation of Turbine No. 3. Mr. Sundermeir based his opinion on characteristics of the Utility's steam operations including winter peak demand for the service:

> [T]he existence of Turbine No. 3 has not enabled the Company's Electric Operations to avoid any capacity costs or diminished its need to invest in new generating facilities.
>
> . . . .
>
> Since steam is primarily used for space heating, Turbine No. 3 operates at its lowest level during the summer months and, in fact, its summer capacity rating is only 15 MW. For that reason, the Company also endeavors to schedule maintenance on Turbine No. 3 during periods of low steam load requirements. As a result, Turbine No. 3 is least available when Electric Operations needs it the most.
>
> . . . .
>
> As I indicated earlier in my testimony, the operation of Turbine No. 3 does not avoid any capacity costs or produce any capacity credits for Electric Operations. Therefore, it would be entirely inappropriate to transfer funds from Electric Operations to Steam Operations on this basis. . . . [S]uch transfer would result in a subsidization of Steam Operations by Electric Operations.

In addition to this substantial record support for the Commission's determination, we note that the

regulations at issue, found at 52 Pa. Code §§57.31-57.39 govern only the purchase and sale of energy and energy capacity between public utilities and private "qualifying facilities." *See* 52 Pa. Code §§57.31, 57.32(b), 57.34(a). *See also* 18 C.F.R. §§292.101-292.602 (1984). The University has indicated no authority for its implicit contention that PURPA and the regulations promulgated by the Commission in response thereto have any application to the internal intra-utility accounting matters here at issue. Indeed, the statutory and regulatory definitions of "qualifying facility" would appear to exclude the Utility's Schuylkill Station.[6]

Finally, in this regard, we specifically reject the University's position that we may set aside the Commission's decision for failure of that administrative body to consider expressly and at length each contention and authority marshalled by a party to the proceeding. We have held and we here repeat that it has never been the law of this Commonwealth:

> that an administrative agency must set forth findings specifically noting the rejection, and reasons for such rejection, of each and every minor allegation of a party. A voluminous record does not create, by its bulk alone, a multitude of real issues demanding individual attention. ...

*Application of Midwestern Fidelity Corp.*, 26 Pa. Commonwealth Ct. 211, 230 n. 6, 363 A.2d 892, 902 n. 6 (1976). Moreover, we have held that the Commission's decision is adequate where:

---

[6] A qualifying cogeneration facility is defined, *inter alia*, as an electrical cogeneration facility which "is owned by a person *not* primarily engaged in the generation or sale of electric power. . . ." 16 U.S.C. §796(18)(B)(ii); 18 C.F.R. §292.206 (1984). (Emphasis added.)

on each of the points [now raised] the Commission was faced simply with a choice of actions, each fully explained in the record and the Commission's choice in each case amounted to an implicit acceptance of the thesis of the party which prevailed and a rejection of the contentions of the loser.

*UGI Corporation v. Pennsylvania Public Utility Commission,* 49 Pa. Commonwealth Ct. 69, 92, 410 A.2d 923, 935 (1980).

## COST OF CAPITAL

The Commission's analysis of general rate increase requests like the one here at issue involves, in general, determination of a rate of return to be applied to a rate base measured by the aggregate value of all Utility property used and useful in the public service. Determination of a proper rate of return requires, at its most fundamental level, calculation of the Utility's actual or hypothetical capital structure and, with regard to the various species of capital, the cost of that capital during the period at issue.

In this case, the Commission determined the cost to the Utility of incurring long-term debt capital to be 10.98%, reflecting the cost of recent borrowings by the Utility, the anticipated cost of near term future borrowings and predictions as to the then effective prime rate. The University argued before the ALJ and the Commission for the appropriateness of a 6.91% cost of long-term debt. This position was predicated on an analysis of differences in timing between the Steam Division and the Utility as a whole in incurring long-term debt. Specifically, Dr. Jeremy J. Siegal, an Associate Professor of Finance at the Wharton School of the University of Pennsylvania, testified on behalf of the City of Philadelphia, a steam consumer, that virtually no capital investments have

been made with respect to the Steam Division in recent years while substantial investment and its attendant cost, including costs of long-term debt, have been incurred by the Utility in connection with its electrical service operations. Dr. Siegal proposed the recognition of this disparity by means of a computational paradigm including the tracing of capital costs to the year in which the plant was installed by the Utility and the treatment of the Steam Division's debt needs and costs as if the Division were a wholly-owned subsidiary of the Utility with the power to issue on its own debt instruments and preferred stock.

This paradigm was the subject of criticism by Joseph F. Brennan, an expert witness for the Utility; who testified, in part, as follows:

It is common knowledge that when capital is attracted to finance plant, it can be identified when it enters the treasury, but when cash is spent to pay for plant, the cash cannot be traced to specific sources of capital. . . . The mere fact that plant might have been built in a given year and securities might have been issued in that year, is no proof whatsoever that those securities are the securities financing the plant additions.

. . . .

There is nothing wrong at all with the notion that price of service for the Steam Division of Philadelphia Electric could be based upon Philadelphia Electric Steam Division being treated as a separate wholly owned subsidiary. Indeed, that is exactly what this Company has proposed and what this Commission has employed in the past to arrive at the allowed or authorized price of service in regard to revenues and all costs but capital costs. The fact

is the Steam Division is not a wholly owned subsidiary and it does not issue its own securities. If it did, it is most unlikely that the capital structure ratios and capital cost rates would mirror [the Utility's] capital structure ratios and capital cost rates. . . .

Mr. Brennan concluded that treatment of the Steam Division as a wholly-owned subsidiary would not result in lowered capital costs but that, just to the contrary, the capital structure of this hypothetical subsidiary, its inevitably low bond rating and rate of return, and its need to enter the financial markets to finance yearly debts as low as $40,000.00, would cause the capital costs to the Steam Division to increase if Dr. Siegal's analysis were faithfully employed. The Commission credited Mr. Brennan's testimony and concluded as follows:

Secondly, we reject the City's argument that for *cost of debt purposes,* PECO-Steam Division should be treated as if it raised its own capital in the market place. We have previously adopted the consolidated approach to the cost of capital irrespective of whether the utility for whom [sic] rates were being set was a separate operating division . . . (citations omitted) or a separate corporate entity which issued its own debt. . . . (citation omitted) (emphasis in the original).

We are presented with testimony that indicates that, standing alone, and with the Steam Division's average rate of return of approximately 3.65% between 1952 and 1981, and its loss during 1971 and 1974 (Record citations omitted), and assuming the Steam Operations access to the capital markets, the cost of a $40,-000 debt offering would have an effective cost

rate of 20% (Record citation omitted). It is readily apparent that if PECO's-Steam Division were not treated as part of its parent for the purpose of capital attraction, the embedded cost of debt would be considerably higher than that suggested here.

The University does not criticize this reasoning of the Commission but instead attacks only the alternative rationale credited by the ALJ and the Commission for rejection of Dr. Siegal's paradigm having to do with the tracing of funds used to finance plant additions and acquisitions. However, the analysis of the Commission set forth above is supported by the record and is an adequate justification for the Commission's determination in this regard. Determination as to cost of capital is basically a matter of judgment which should be left to the regulatory agency and not disturbed in the absence of a manifest abuse of discretion. *Equitable Gas Co. v. Pennsylvania Public Utility Commission*, 45 Pa. Commonwealth Ct. 610, 405 A.2d 1055 (1979). We will not substitute our judgment for that of the Commission in a context so arcane that it permits on this record each pole in the debate to attract its expert adherents.

### WILLOW STATION

The University further contends that the ALJ and the Commission erred in rejecting its contention that Willow Station ought not to be included in the Utility's rate base. Specifically, the University proposed a reduction of $4,976,000.00 representing plant in service and an offset of $3,446,000.00 representing the accrued depreciation reserve associated with Willow Station.

The Commission found that Willow Station's steam production capacity of 756 MMlbs./hour is necessary to meet the projected peak demand of the

Utility's consumers. This finding is based on a determination of the capacity of Schuylkill Station some 315 MMlbs./hour less than the theoretical maximum utilized by the University. This reduction in turn, is supported by the testimony of the Utility's expert witness Thomas P. Hill, Jr., who described the limitation of the available capacity of Schuylkill Station as a function of the capacity of the associated water demineralizing plant necessary for operation of the steam boilers. We have reviewed the record including the testimony of Mr. Hill and we are satisfied that the record adequately supports the Commission's determination that Willow Station is used and useful in provision of the Utility's public service.

However, the University contends that even if rate base inclusion of Willow Station is justified, the level of operating and maintenance expenses associated with this facility as well as the expenses associated with Edison and Schuylkill Station must be reduced to reflect the conceded reduction in recent years in the total utility steam output. The Commission accepted its staff's proposal to normalize Schuylkill Station's operating expense accounts 3374.2, 3374.3, and 3925 thereby reducing the Utility's claim by $679,000.00. The Commission further disallowed the Utility's $146,000.00 inflation claim assertedly associated with Schuylkill Station's maintenance expenses; the $210,000.00 claim for replacement of resin used in boiler water purification; and the $190,000.00 claim for furnace and casting repair.

With respect to its rejection of the University's proposed $385,033.00 reduction in Edison Station's budgeted maintenance and operating expenses, predicated on reduced steam output, the Commission relied on the Utility's expert witness Thomas P. Hill, Jr. who testified as follows:

It does not matter what the aggregate total output of a plant was, since manpower staffing levels are dictated instead by fixed requirements and peak requirements. A position of the labor expense associated with Steam Production Plant is necessarily associated with day-to-day activities which are not a function of plant output. For example, the costs associated with annual inspections, station light and power etc. are incurred irrespective of the level of production. These "no land" operation manpower requirements are also dictated by plant design and age.

The Commission's decision in this regard is adequately supported by the evidence of record.

## II. Allocation of the Burden of Proof.

### FUEL INVENTORY

The University also contends that the Commission here improperly relieved the Utility in three instances of its statutory burden to prove its entitlement to the requested rate increase. With respect to the Utility's requested increase in fuel inventory, the University contended that the inventory should instead be reduced by about 50% on account of the substantial reduction in the Utility's overall steam output; thereby disallowing some $809,409.00 of the Utility's claim. In support of its contention, the University adduced the expert testimony of Dr. Robert M. Wirtshafter who opined that the ratio of total steam output to fuel inventory should be no greater today than it was in 1978, the application of which ratio would result in the proferred disallowance.

The Commission considered witness Wirtshafter's analysis but found it wanting. This determination is

supported by the testimony of the Utility's expert witness Hill who explained that there is no fixed mathematical relationship between steam output and needed fuel inventory. Moreover, Mr. Hill described the discontinuance in 1981 of an arrangement with the Utility's largest fuel supplier which had previously obviated the need for a substantial portion of the Utility's fuel inventory storage. The Commission reasoned:

> [W]e disagree with the method utilized to calculate the appropriate level of inventory. Dr. Wirtshafter assumes that the "oil inventory held in 1983 should be in roughly the same proportion to 1983 production as 1978 inventory is to 1978 production." . . . From this assumption, Dr. Wirtshafter calculates that the 1983 oil inventory should contain only 25,758 Bbls. compared to the 49,639 Bbls. claimed. We are not convinced that the relationship described by Dr. Wirtshafter exists between the amount of steam production and the inventory requirements of the Company.

The University places particular emphasis on the closing sentence of this portion of the Commission's opinion arguing that it evinces an improper allocation by the Commission of the burden of proof in this rate case. We disagree. The public utility bears the burden as to each of its claims presented in the context of a rate case. *Brockway Glass Co. v. Pennsylvania Public Utility Commission,* 63 Pa. Commonwealth Ct. 238, 437 A.2d 1067 (1981); *Pennsylvania Public Utility Commission v. Laurel Pipe Line Co.,* 29 Pa. Commonwealth Ct. 351, 370 A.2d 1252 (1977). Here, the Utility adduced sufficient evidentiary support, in the absence of an effective evidentiary rebuttal, for its fuel

inventory claim. The University attempted such a rebuttal by means of proof of the changing ratio over time of steam output to fuel inventory. The Commission's rejection of the significance of this proof is supported by the evidence of record and, therefore, the initial Utility claim remains unrebutted. Rejection of contrary evidence does not accomplish an impermissible shifting of the evidentiary burden. *United States Steel Corp. v. Pennsylvania Public Utility Commission,* 72 Pa. Commonwealth Ct. 171, 456 A.2d 686 (1983); *Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission,* 52 Pa. Commonwealth Ct. 201, 415 A.2d 937 (1980). We find no impropriety in the Commission's acceptance of this claim.

## CASH WORKING CAPITAL

The considerations explored in the section immediately preceding apply as well to the University's attack on the Commission's decision with regard to cash working capital. Cash working capital is an element of rate base valuation and is measured by those funds of the Utility needed to bridge the gap between the rendition of service to customers and the receipt of payment for those services. *City of Pittsburgh v. Pennsylvania Public Utility Commission,* 171 Pa. Superior Ct. 187, 90 A.2d 607 (1952). Here the Utility proferred evidentiary support for its cash working capital claim in the form of the results of a revenue-expense lag study consistently approved by the Commission in connection with the Utility's electric operations. This study indicated a net lag in receipt of revenues of thirty-six days which figure was multiplied by the daily test year claimed operating and expense level to derive the Utility's request for $7.2 million of cash working capital. The Commission dis-

allowed $1.8 million of this request reflecting adjustments made to the Utility's claimed operating and maintenance expenses.

Raising the issue for the first time in its Reply Brief filed with the ALJ, the University presented below, and renews here, its position that the Utility ought to have conducted a separate revenue-expense lag study with respect to its Steam Consumers and ought not to be permitted to rely on such a study, as was here utilized, encompassing the customers of the Utility's electric customers as well. The Commission, noting that the late interposition of this contention denied the Utility a procedural opportunity to present responsive argument, rejected the University's position as follows:

> While we agree that a separate lead-lag study for steam heat customers would be preferred, we find no evidence in the record before us which would call PECO-Steam's request into question. Accordingly, the University's exception is denied.

Again, the University contends that this language indicates an improper allocation of the burden of proof. Again, we disagree. The Utility, of course, had the burden of proving its cash working capital claim. This burden was not met by the introduction of the results of one revenue-expense lag study. The University's late contention that the study was flawed was unsupported by any evidence of the effect, if any, which the alternative study suggested by the University would have on the claim. Rejection of the University's exception was not an allocation of the burden of proof but merely the demonstration of the Commission's judgment that the record evidence considered as a whole supported the Utility's request. There

was no error. *See Burleson v. Pennsylvania Public Utility Commission*, 501 Pa. 433, 461 A.2d 1234 (1983).

## DEPRECIATION

Application of the principles of appellate review described in earlier portions of this opinion require acceptance of the University's final suggestion of error in the Commission's decision with respect to the amount of depreciation fairly to be borne as an expense by the Utility's steam consumers. Specifically, we find that the record contains insufficient evidence to support the Commission's determination in this regard and we, therefore, remand for further proceedings.

At its most theoretical, depreciation is an accounting tool consisting typically of a charge against current revenues permitting the owner of a capital item to recover its cost over its useful lifetime and, thereby, to create a fund for replacement of the capital item following its retirement. Thus, a central inquiry on which a depreciation claim must be based, is the useful life of the capital asset at issue. Where, as in this case, the inquiry must encompass many capital assets purchased and constructed over many years, recourse to accepted statistical methods including an actuarial analysis of interim plant retirements is usually necessary.

Such studies were performed by the Utility in support of the general rate increase here subject to review. However, the claimed depreciation reserve for steam production and distribution plant is justified only in part by the results of those statistical and actuarial investigations. More fundamentally, the depreciation claim, as the Utility's evidence makes clear

> reflect[s] management judgment that the steam
> plant investment should be recovered by the

year 2000 based on the plant's physical condition and the economic uncertainties of supplying steam in downtown Philadelphia.[7]

Specifically, the Utility's annual depreciation claim related to the Willow Station steam heating plant is premised on retirement of the whole of that plant by 1995 and the depreciation claim related to the Edison Station steam heating plant as well as the Utility's steam distribution plant is premised on the retirement of the whole of that plant by 2000. As the University argues, this premise has the effect of allowing the Utility to recover its 1977 investment of more than $2 million in steam distribution mains over the twenty-three year period between that date and the terminal date fixed by "management judgment" although the evidence indicates such distribution mains to have a useful life in excess of ninety years.

A depreciation claim must be supported by substantial competent evidence of record. *Cohen v. Pennsylvania Public Utility Commission*, 76 Pa. Commonwealth Ct. 353, 463 A.2d 1274 (1983); *Pennsylvania Power and Light Company v. Pennsylvania Public Utility Commission*, 10 Pa. Commonwealth Ct. 328, 311 A.2d 151 (1973). Both the ALJ and the Commission here recognized that the record contained nothing more substantial than the bare assertion itself to support the Utility's premise that all steam production and distribution plants would be retired by the year 2000. However, the ALJ and the Commission accepted the claim and the Commission explained this acceptance as follows:

Although [the Utility's expert witness, Dr. Robert M.] Wirtshafter criticized the selection of the year 2000 as a terminal date he does not

---

[7] Utility Exhibit TPH-2.

suggest an alternative terminal date for us to consider. Also, Dr. Wirtshafter apparently does not disagree with the Company's basic premise that steam plant should be life-spanned because he does *not* proffer an alternative depreciation technique for our consideration. (Emphasis in the original.)

We must agree with the University that the Commission here accepted an unsupported and facially incongruous claim of the Utility on the apparent ground that excepting consumers had also failed to proffer evidence or an analytic methodology supportive of the requested reduction. The University was under no obligation to adduce either evidence or analysis. The failure of the Utility to support its claim for annual depreciation[8] requires its disallowance. In this respect alone, we will reverse the order of the Commission and remand for further proceedings. We affirm the Commission's order in all other respects. Jurisdiction relinquished.

ORDER

AND Now, this 18th day of December, 1984, the Order of the Pennsylvania Public Utility Commission above-captioned and entered April 29, 1983 insofar as it encompasses allowed annual depreciation calculated with reference to a retirement date for all steam production and distribution plant of the year 2000, is reversed and the record is remanded for further proceedings consistent with this Opinion. In all other respects, the Order of the Commission is affirmed. Jurisdiction is relinquished.

---

[8] No challenge is here presented to the Utility's claim for accrued depreciation.